**F I L E D**
United States Court of Appeals
Tenth Circuit

APR 21 1999

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

GREGORY CHECORA, WARRENELL
CUCH, BOBBY REDCAP, and REUBEN
CUCH, JR.,

      Defendants-Appellants.

Nos. 97-4184, 97-4190,
97-4191, 97-4192

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 97-CR-235-01,-03, -04, -02)**

---

Julie George McPherson, Salt Lake City, Utah, for Defendant-Appellant Gregory
Checora.

John Bruce Savage, Jr., Park City, Utah, for Defendant-Appellant Warrenell Cuch.

James C. Bradshaw, Salt Lake City, Utah, for Defendant-Appellant Bobby Redcap.

Jerome H. Mooney, III, Mooney Law Firm, P.C., Salt Lake City, Utah, for Defendant-
Appellant Reuben Cuch, Jr.

Felice J. Viti and Richard MacDougal (David J. Schwendiman, United States Attorney,
with them on the briefs), Salt Lake City, Utah, for Plaintiff-Appellee United States of
America.

Before **SEYMOUR**, Chief Judge; **PORFILIO**, Circuit Judge; and **TACHA**, Circuit Judge.

———————————————

**PORFILIO**, Circuit Judge.

———————————————

Gregory Checora, Reuben Cuch, Warrenell Cuch, and Bobby Redcap all pled guilty to committing voluntary manslaughter while within Indian Country. Defendants beat their victim during a fight, dragged him to an abandoned house, slit his throat twice, and then placed a 360-pound stove on him to conceal the body. At sentencing, the district court enhanced each defendant's offense level because the victim was unusually vulnerable and physically restrained. The court also departed upward six levels for each defendant because of extreme conduct.

All defendants appeal from these Sentencing Guidelines increases. In addition, Warrenell Cuch challenges the restitution order in his case. Because the district court gave no principled reason for the extent of its upward departures, we remand for specific findings. We also vacate a portion of the restitution orders entered in this case. In all other respects, the sentences are affirmed.

# I

On July 3, 1996, defendants Gregory Checora, age 19, Reuben Cuch, 16, Warrenell Cuch, 23, and Bobby Redcap, 18, were drinking beer and vodka with friends at

the residence of Bonnie McKinley, the grandmother of Checora and Redcap. All four defendants had been drinking throughout the day and continued to do so into the evening. Sometime around midnight, the victim in this case, Benjie Murray, arrived at the McKinley residence and was invited to drink with the others. Murray had also been drinking throughout the day and was already intoxicated when he joined the group.

At some point during the early morning hours, Murray made some derogatory comments to Warrenell Cuch, and in retaliation Warrenell struck him in the face, triggering a minor fistfight. Checora and Reuben Cuch broke up the fight and tried to discourage further fighting. Nevertheless, Murray remained with the group, continued to drink, and continued to excoriate Warrenell Cuch. After a time, the fighting began anew and the beating of Murray escalated. Redcap joined Warrenell Cuch in the fighting. Both defendants punched Murray in the face several times. Eventually, the fighting ceased and more attempts were made to defuse the situation.

Nonetheless, for the third time, a fight broke out. During this fight, Murray accidentally struck Checora while attempting to defend himself. This enraged all four defendants to the point that they all joined in the fighting, and all four began to beat Murray in earnest. Each of the defendants hit and kicked Benjie Murray about the head and body. Reuben Cuch and Bobby Redcap stomped on the victim's head several times with their shoes. At one point, Murray tried to run away, but Reuben and Bobby chased after him and tackled him to the ground. The beating then continued until Murray lay

motionless.  The district court found the three fighting incidents occurred during the course of one hour.[1]

Checora attempted to revive Murray with a wet washcloth but was unsuccessful. The defendants then dragged Murray, who was still alive but semi-conscious, to an abandoned house fifty feet east of the McKinley residence.  They placed him face down on the ground.  A discussion ensued about what should be done next.  Redcap suggested they should cut Murray's throat.  He obtained a steak knife and gave it to Warrenell

---

[1]Redcap suggests the entire beating "probably lasted five to ten minutes."  We reject that contention.  The district court concluded the three phases occurred over the course of one hour and its finding is not clearly erroneous.  Although Redcap proffers evidence to contradict the district court's findings, we conclude that at most that evidence presented the district court with an alternate, permissible account of events.  The district court found one version more credible than the other, as it is within its power to do.

Cuch.[2] Murray attempted to get up but was unable to do so. Warrenell then lifted

Murray's head by the hair and slit his throat twice with the knife.

Curious about whether the victim was still alive, Bobby Redcap then placed his

hand over Murray's chest. He felt that Murray's heart seemed to stop beating and he

announced to the others that Murray was dead. Checora and Reuben Cuch then

illuminated the victim with a cigarette lighter and observed a pool of blood around his

head. Approximately ten minutes later, following further deliberation, the defendants[3]

---

[2]The district court based this finding (and some others) on statements made by co-defendants at their change of plea and sentencing hearings. Redcap contends the district court violated his due process rights by doing so because his counsel was not present at those hearings and could not confront or cross-examine the co-defendants. We reject this argument. A "defendant at sentencing does not have an absolute right to confront witnesses whose information is made available to the court." *United States v. Beaulieu*, 893 F.2d 1177, 1180 (10th Cir. 1990). The "fact that some material, upon which the trial judge relied, may have had its source in a judicial proceeding in which appellant was not a defendant or represented by counsel does not bar its use." *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989). It is therefore not a denial of due process for the trial judge, when determining a sentence, to rely on evidence given by witnesses whom the defendant could neither confront nor cross-examine. *See Williams v. New York*, 337 U.S. 241, 250-51 (1949).

Redcap also contends he did not have adequate notice of and opportunity to rebut his co-defendants' testimony through methods other than cross-examination. He claims this also deprived him of due process. We reject this contention as well. Redcap's Presentence Report specifically relied upon the testimony of his co-defendants, particularly in its response to Redcap's objections, thereby giving him notice of the statements that would be used against him. Therefore, Redcap did have an opportunity to refute the inculpatory information; he could have done so in writing or in open court at his own sentencing hearing.

[3]Redcap claims he did not participate in placing the stove on the victim's body and that such action should therefore not enhance his sentence in any way. Again, we reject this argument. Redcap admits there is evidence that suggests he assisted with the stove

(continued...)

placed a 360-pound iron stove on Murray's body in an effort to conceal him. The body remained under the stove until it was discovered four days later.

The subsequent autopsy indicated that Murray had suffered multiple fractures to the face and jaw consistent with blunt force trauma. He also incurred sharp force injuries on his neck and compressional injuries throughout his body. Murray's wounds were distorted to such an extent, however, due to the body's state of decomposition and extensive animal and insect activity, that the exact cause and time of death could not be determined. Accordingly, the report concluded that Murray suffered three types of injury--blunt, sharp, and compressional--and that these injuries, either separately or in combination, could have resulted in Murray's death.

All four defendants were indicted for second-degree murder and aiding and abetting while within Indian Country. The defendants chose to plead guilty to an information charging them with voluntary manslaughter and aiding and abetting while within Indian Country. At the sentencing hearing, each defendant's offense level calculation was identical. The district court began with a base offense level of 25. *See* 1995 U.S.S.G. § 2A1.3. The court then added two offense levels because Benjie Murray was a vulnerable victim, *see id.* § 3A1.1(b), and two offense levels because he had been physically restrained in the course of the offense, *see id.* § 3A1.3. The court next

---

(...continued)
but he nevertheless asks us to find clear error "in light of the more credible evidence to the contrary." We decline to do so. Questions of witness credibility are for the trial court to decide, not for the court of appeals.

decreased the offense level by three for acceptance of responsibility. *See id.* § 3E1.1(b).

Finally, the district court departed upward six levels because it found the defendants'

conduct to be "unusually heinous, cruel, brutal, or degrading to the victim." *Id.* § 5K2.8.

The final calculation resulted in a total offense level of 32. Ultimately, the court

sentenced each defendant to 120 months (the statutory maximum), 36 months of

supervised release, and restitution in the amount of $10,165. This appeal ensued.


**II**

Defendants first argue the district court erred in applying the vulnerable-victim

enhancement found in 1995 U.S.S.G. § 3A1.1(b). Section 3A1.1(b) provides that if the

"defendant knew or should have known that a victim of the offense was unusually

vulnerable due to age, physical or mental condition, or that a victim was otherwise

particularly susceptible to the criminal conduct, increase by 2 levels." *Id.* The district

court found that Murray was vulnerable because he "was small, he was vulnerable

because he was outnumbered, he was vulnerable because he was drunk and it's clear to

me that he was not in a situation where he could run away." It also found "[Murray] had

minimal ability to fight back or defend himself. He was small, 5 feet 3 inches, weighed

less than 150 pounds, there were four assailants." The defendants were 5' 5" 180 pounds,

5' 10" 190 pounds, 5' 7" 196 pounds, and 5' 10" 160 pounds. The court further concluded

that the defendants "knew [Murray] was intoxicated" or "certainly should have known that he was a vulnerable victim."

Defendants advance several challenges to the district court's application of this enhancement. We review challenges to the district court's underlying factual findings for clear error. *See United States v. Hardesty*, 105 F.3d 558, 559 (10th Cir. 1997). But to the extent the defendants ask us to interpret the Guidelines or hold the facts found by the district court are insufficient as a matter of law to warrant an enhancement, we must conduct a *de novo* review. *See United States v. Shumway*, 112 F.3d 1413, 1422 (10th Cir. 1997); *United States v. Roberts*, 898 F.2d 1465, 1468-69 (10th Cir. 1990). Performing the necessary review, we find no error in the district court's decision to apply the vulnerable-victim enhancement.

Defendants first contend they were too drunk to know that Murray was vulnerable by virtue of his intoxication. This argument misses the mark. Whether the defendants actually knew Murray was intoxicated is not necessarily dispositive. The vulnerable-victim enhancement is also appropriate if the defendant "*should have known* that a victim of the offense was unusually vulnerable . . . [or] otherwise particularly susceptible to the criminal conduct." 1995 U.S.S.G. § 3A1.1(b) (emphasis added). The district court found this aspect satisfied, and we conclude that finding is supported by the record.

Murray arrived at Ms. McKinley's residence already intoxicated and continued to drink throughout the early morning hours. Defendants were not so completely inebriated

that they had no ability to comprehend Murray's condition. *Cf. United States v. Salemi*, 26 F.3d 1084, 1087-88 (11th Cir. 1994) (upholding vulnerable-victim enhancement even where defendant's mental illness and emotional condition may have clouded his ability to perceive the victim's particular vulnerability). Furthermore, the defendants' alleged cognitive incapacitation was of their own doing. *Cf. United States v. Luscier*, 983 F.2d 1507, 1514 (9th Cir. 1993) (upholding vulnerable-victim enhancement where the defendant was responsible for his own intoxication). Based on these facts, we conclude the district court did not clearly err when it found the defendants should have been aware that Murray was intoxicated.[4]

Defendants next posit that Benjie Murray's size cannot be the basis for the enhancement because he "did not present himself as a man so small in stature . . . that he could not defend himself." This factual contention is belied by the record. As the district court correctly found: "[Murray] had minimal ability to fight back or defend himself. He was small, 5 feet 3 inches, weighed less than 150 pounds" and all the assailants were significantly larger. Notably, the defendants even admit on appeal that "the victim was . . . on the small side for an adult male."

---

[4]Defendants also argue the enhancement was improper because none of the evidence indicates they specifically targeted Murray because of any particular vulnerability. The argument is frivolous. We have already stated on several occasions that section 3A1.1(b) does not require a finding that the defendant intentionally targeted the victim because of the victim's vulnerability. *See, e.g., United States v. Smith*, 133 F.3d 737, 749 (10th Cir. 1997); *United States v. Hardesty*, 105 F.3d 558, 560-61 (10th Cir. 1997).

Furthermore, and contrary to the defendants' assertions, we also conclude the trial court was correct to consider this size disparity. Although the focus of the vulnerable-victim enhancement must be on the particular traits of the victim, "information about a defendant may be relevant in assessing a victim's vulnerability." *United States v. Tissnolthtos*, 115 F.3d 759, 761-62 (10th Cir. 1997); *see also United States v. Coates*, 996 F.2d 939, 942 (8th Cir. 1993); *United States v. Boult*, 905 F.2d 1137, 1139 (8th Cir. 1990). Thus, a court may consider the totality of the circumstances in determining whether the victim was particularly susceptible to criminal conduct. *See United States v. Hershkowitz*, 968 F.2d 1503, 1506 (2d Cir. 1992). Here, the district court did not rely on the size disparity alone to enhance the defendants' sentences. Rather, the court considered relative size as one of several factors that rendered Murray an unusually vulnerable victim under the totality of the circumstances.

Because the defendants have failed to persuade us of any legal error and there is ample evidence in the record to support the district court's factual findings, we affirm its decision to apply the vulnerability enhancement. The fact Murray was outnumbered, intoxicated, and much smaller in stature than his assailants suggests to us, as it did to the district court, that he was particularly susceptible to the defendants' criminal conduct.

**III**

Defendants next challenge the district court's decision to enhance their sentences on the ground that Murray was physically restrained. Section 3A1.3 provides for a two-level increase in the offense level where a victim was physically restrained during the offense. *See* 1995 U.S.S.G. § 3A1.3. The district court determined the defendants restrained Murray when they dragged him from the place where he was beaten to the place where his throat was cut and when they placed the iron stove over his body. After a review of the record, however, we elect to affirm the district court's application of this enhancement on an alternate ground. Reuben Cuch and Bobby Redcap physically restrained Murray within the meaning of the Guidelines when they chased and tackled him to the ground to prevent his escape. Warrenell Cuch and Gregory Checora are accountable for this restraint under the relevant conduct provisions of section 1B1.3.

Section 3A1.3 of the Guidelines provides that "[i]f a victim was physically restrained in the course of the offense, increase by 2 levels." 1995 U.S.S.G. § 3A1.3. The commentary to section 1B1.1 defines "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." *Id.* § 1B1.1 comm. n.1(i); *see also Roberts*, 898 F.2d at 1470 (holding the examples given in the guideline are merely illustrative and not exhaustive). Read in combination, the guideline and commentary require that there be a forcible restraint[5] of a victim which occurs during commission of

---

[5]Although the guideline also requires the restraint to be "physical," we have held

(continued...)

the offense. In light of all the circumstances, we believe the proper issue before us is whether the chasing and tackling of Murray to prevent his escape constitutes "forcible restraint," within the meaning of the Guidelines.

"The Sentencing Guidelines are to be interpreted as if they were statutes or court rules and, in the absence of any contrary intention, we must apply their clear and unambiguous terms." *United States v. Duran*, 127 F.3d 911, 918 (10th Cir. 1997). If a word in the Sentencing Guidelines is not specifically defined and does not have an established common-law meaning, the word must be given its ordinary meaning. *See Chapman v. United States*, 500 U.S. 453, 461-62 (1991). Because neither "forcible" nor "restraint" is defined by the Guidelines, we assume the Sentencing Commission intended to convey the ordinary meaning of those words.

Using that precept, we first conclude that by "forcible," the Commission meant the defendant must use physical force or another form of compulsion to achieve the restraint. *See Webster's Third New International Dictionary* 888 (1993); *see also United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) ("Forcible is defined as '1. Achieved by use of

---

[5](...continued)
that "[p]hysical restraint is not limited to physical touching of the victim." *United States v. Fisher*, 132 F.3d 1327, 1329 (10th Cir. 1997). Furthermore, we note that even though the words "forcible restraint" do not appear in section 3A1.3, and instead appear in a commentary to section 1B1.1, the commentary's explanation is authoritative because it does not violate the Constitution or a federal statute and it is not inconsistent with or a plainly erroneous reading of section 3A1.3. *See Stinson v. United States*, 508 U.S. 36, 38 (1993) (discussing when Guidelines commentary is authoritative ); *United States v. Frazier*, 53 F.3d 1105, 1112 (10th Cir. 1995) (same).

force.'"). This reading is consistent with our previous decisions regarding physical restraint. *See, e.g., United States v. Fisher*, 132 F.3d 1327, 1329-30 (10th Cir. 1997); *Roberts*, 898 F.2d at 1466-70. Similarly, we conclude the Commission intended "restraint" to mean the defendant's conduct must hold the victim back from some action, procedure, or course, prevent the victim from doing something, or otherwise keep the victim within bounds or under control. *See Webster's Third New International Dictionary* 1936 (1993); *see also United States v. Anglin*, No. 98-1340, 1999 WL 101321, at *12 (2d Cir. 1999) (providing similar definition); *United States v. Foppe*, 993 F.2d 1444, 1452 (9th Cir. 1993) (same). As we recently stated, "[k]eeping someone from doing something is inherent within the concept of restraint." *Fisher*, 132 F.3d at 1330 (emphasis omitted).

Applying the Guidelines' clear and unambiguous terms, we conclude that a physical restraint occurred, within the meaning of section 3A1.3, when Reuben Cuch and Bobby Redcap tackled Murray to the ground to prevent his escape. The defendants used physical force to stop Murray from escaping and thus forcibly denied him freedom of movement. Their actions facilitated commission of the offense and therefore further endangered the victim. *Cf.* 1995 U.S.S.G. § 2B3.1(b)(4). The fact the restraint of Murray was brief does not alter our conclusion. As the Ninth Circuit has noted, the "Guidelines do not distinguish between long and short-term restraint, and neither will we." *Foppe*, 993 F.2d at 1452.

We further conclude that even though Warrenell Cuch and Gregory Checora did not directly restrain Murray, they must nevertheless be held responsible for the conduct of their co-defendants. The Guidelines provide that section 3A1.3 enhancements shall be determined, in the case of a jointly undertaken criminal activity, on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." 1995 U.S.S.G. § 1B1.3(a)(1)(B). Although the district court did not make any specific findings on this point, it is clear from the record that the chasing and tackling of Murray during the fight was more than likely foreseeable and in furtherance of the defendants' objective. As we have already noted, prior to the act of restraint, all four defendants had joined in the fighting in earnest. At that time, the defendants had all agreed to beat and injure Murray. Given the defendants' objective, we have little trouble concluding the conduct of Reuben Cuch and Bobby Redcap was in furtherance of this objective and reasonably foreseeable.

Defendants next argue the enhancement is inapplicable because the brief holding that occurred in this case "is inherent in the offense of voluntary manslaughter." Their argument flows from the Guidelines' statement that the victim restraint adjustment may not be applied "where the unlawful restraint of a victim is an element of the offense itself." 1995 U.S.S.G. § 3A1.3 n.2. Defendants argue the chasing and tackling that took

- 14 -

place "was part and parcel of the offense and added nothing to the basic crime" and thus that this "type of restraint is an element of voluntary manslaughter and does not warrant enhancement." We disagree.

The defendants rely on *United States v. Mikalajunas*, 936 F.2d 153 (4th Cir. 1991), to support their position. That reliance is misplaced. In *Mikalajunas*, the defendant struck the victim on the head, the victim attempted to flee, was chased down, caught, held, and then stabbed to death while being held. The Fourth Circuit Court of Appeals held that no physical restraint occurred within the meaning of the Guidelines because the brief holding *during* the stabbing was already an element of the crime of homicide. *See id.* at 156. Notably, however, the decision did not purport to address whether the acts of chasing down and catching the victim could constitute restraint.

Nonetheless, to the extent *Mikalajunas* is contrary to our decision today, we decline to follow it. The physical restraint that occurred in this case is not a necessary element of the crime of voluntary manslaughter. The same offense could be committed against an unrestrained victim. Indeed, voluntary manslaughter may be committed in many different ways and it need not involve the sort of chasing and tackling that occurred in this case. The restraint of Murray to prevent his escape added to the offense, it facilitated its commission. We thus favor the reasoning of the dissent in *Mikalajunas*:

> [R]estraining a victim before he is murdered is not inherent or necessary in accomplishing the murder, but rather can be an independent act which thus may be considered as an enhancing factor under the Sentencing Guidelines . . . . Although the restraint was arguably brief, it was sufficiently restrictive

to keep the victim from completing his flight and avoiding his brutal death .
. . .

*Id.* at 157 (Niemeyer, J., dissenting). Application of the restraint-of-the-victim enhancement was proper in this case.

## IV

Defendants next contend the district court abused its discretion by departing upward six levels based on "extreme conduct" under 1995 U.S.S.G. § 5K2.8. Section 5K2.8 provides that if "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." *Id.* The district court found that Murray was effectively tortured because there was repeated punching, kicking, and stomping over the course of an hour. The attack spanned three separate phases, Murray was dragged fifty feet, had his throat slit twice, and then had a 360-pound iron stove placed across his body. The court concluded that the Sentencing Guidelines did not account for the extended period of pain and torture which Murray consciously endured (for the most part) in this case.

We review the district court's decision to depart and the extent of its departure for an abuse of discretion. *See United States v. Collins*, 122 F.3d 1297, 1303 (10th Cir. 1997). Ultimately, we conclude the district court did not abuse its discretion when it

determined that each defendant's individual conduct separately warranted an upward departure. Nevertheless, because the court gave no principled reason for the extent of the departures given, we must remand for further findings.

Defendants principally contend that the facts of the case do not fall outside the "heartland" anticipated by the guideline on voluntary manslaughter. They argue that although their individual conduct may be disturbing, it falls squarely within the universe of voluntary manslaughters. In that vein, we must determine whether "certain aspects of the case [are] unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon v. United States*, 518 U.S. 81, 98 (1996). "The Supreme Court in *Koon* made clear that [whether a case is unusual] is largely for the district court to answer." *Collins*, 122 F.3d at 1302. Thus, we must afford great deference to the district court's determination of whether the factual circumstances make this the atypical case. *See id.* at 1302-03.

Voluntary manslaughter is defined as the "unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a) (1994). The issue before us is whether the conduct of each defendant falls outside the heartland of a typical voluntary manslaughter case. We believe their conduct does.

The district court acted within the bounds of its discretion when it first concluded that Warrenell Cuch's conduct was unusually brutal within the universe of voluntary manslaughters. As the record stands before us, it is clear that Warrenell Cuch was

involved in all three phases of the beating. He also dragged the body of the victim, slit his throat twice, and then placed the 360-pound iron stove on him. The totality of the circumstances supports the conclusion that Murray suffered a form of torture or prolonging of pain at the hands of Warrenell Cuch. Warrenell beat Murray in three separate phases over the course of one hour, and not in one continuous and brief instance like most voluntary manslaughter cases. *See, e.g., United States v. Benally*, 146 F.3d 1232 (10th Cir. 1998) (victim beaten and stabbed during fight); *United States v. Hatatley*, 130 F.3d 1399 (10th Cir. 1997) (victim beaten in the course of five minutes); *United States v. Carney*, 106 F.3d 315 (10th Cir. 1997) (drunken defendant shot and killed victim); *United States v. Tsosie*, 14 F.3d 1438 (10th Cir. 1994) (victim stabbed in fight over affair); *United States v. Comosona*, 848 F.2d 1110 (10th Cir. 1988) (victim stabbed after short family fight). He then continued the torture when he dragged Murray to the abandoned house, slit his throat twice, and placed an iron stove on his body.

This cumulative form of damage also constitutes, at the very least, gratuitous infliction of injury. *See United States v. Kelly*, 1 F.3d 1137, 1144 (10th Cir. 1993) (recognizing repetitive and severe nature of injuries as gratuitous infliction of injury). The autopsy report concluded that Murray suffered three types of trauma--blunt, sharp, and compressional--and that these injuries, *separately* or in combination, could have resulted in Murray's death. Warrenell's actions went beyond the threshold necessary to kill the victim.

We can also see no abuse of discretion in the court's conclusion that Bobby Redcap's conduct was unusually heinous, brutal, or degrading to the victim. Although Redcap was not involved in phase one of the fight, he did participate in the second and third phases. Those phases, especially the last one, were undoubtedly the most brutal of the three. Redcap hit and kicked Murray about the head and body and stomped on the victim's head with his boots. The defendant himself admitted that he "kicked Murray in the face about 4 times while he was on the ground and noticed that Murray was bleeding but [he] kept kicking Murray in the face." Moreover, Redcap helped drag the victim to the abandoned house and supplied Warrenell Cuch with the steak knife. Lastly, and more importantly, Redcap helped place the stove on Murray's body. As with his co-defendant Warrenell Cuch, Bobby Redcap's actions could be seen as a form of torture or gratuitous infliction of injury.

Whether the actions of Gregory Checora and Reuben Cuch warrant a departure is a closer issue. It appears from the record that Checora and Reuben did not participate in phases one and two of the fight; in fact, both defendants had attempted to defuse the situation. Moreover, neither actively participated in slitting the victim's throat. Because they only directly participated in phase three of the fight and in placing the stove on the victim's body, they argue an upward departure is unwarranted. We disagree. Given the great deference we must give to the district court following *Koon*, we conclude the court acted within the limits of its discretion when it concluded their actions were unusually

brutal. As we noted, the third phase was without question the most heinous. Both defendants beat Murray until he lay motionless, and as Bobby Redcap had done, Reuben Cuch stomped on the victim's head. The injuries at this stage were unusually severe. Furthermore, the placing of the stove on Murray's body constituted a gratuitous infliction of injury. Terrible things were done to this victim, and these two defendants had a meaningful part in it.

Defendants next contend the district court engaged in double counting when it departed upward for extreme conduct and applied vulnerable-victim and restraint-of-the-victim enhancements. "Impermissible double counting or cumulative sentencing 'occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes.'" *Fisher*, 132 F.3d at 1329 (quoting *United States v. Blake*, 59 F.3d 138, 140 (10th Cir. 1995)). Whether a district court impermissibly double counted is a question of law we review *de novo*. *See United States v. Allen*, 129 F.3d 1159, 1165 (10th Cir. 1997). Our plenary review leads us to conclude there has been no impermissible double counting in this case.

First, the vulnerable-victim enhancement is distinct from and does not serve the same purpose as the extreme conduct provision under section 5K2.8. The extreme conduct provision focuses on the nature and brutality of the defendant's conduct, *see Shumway*, 112 F.3d at 1424; *Kelly*, 1 F.3d at 1143, and accounts for those cases where

the defendant's actions were so heinous, cruel, or brutal that a sentence above the guideline range is warranted. The vulnerable-victim enhancement, however, "focuses heavily on the characteristics of the crime's victim." *Shumway*, 112 F.3d at 1424. It hinges on the idea that some characteristic of the victim renders him particularly susceptible to the criminal conduct and thus in need of greater societal protection than the average citizen. *See id.* at 1423. Given that the two guidelines serve different purposes, it therefore follows the Commission envisioned both could be applied based on the same conduct.

Second, no double counting occurred when the district court enhanced the defendants' sentences for restraining the victim and departed upward for extreme conduct. Even assuming the restraint-of-the-victim enhancement may in some cases overlap with the extreme conduct provision, as the defendants suggest, an overlap has not occurred in this case. Here, the sentence was properly increased under section 3A1.3 because the victim was physically restrained when he was chased and tackled to the ground to prevent his escape. That restraint, however, does not form a basis for the upward departure under section 5K2.8. The circumstances of the case are more than sufficient to justify the upward departure for extreme conduct without consideration of the physical restraint. The district court properly applied both increases.

Lastly, the defendants argue the extent of their departures was not adequately supported by particularized findings. They claim "the basis for the court's decision to

depart six levels instead of four, or two, is not apparent from the record." This argument

has merit.

We have held that in departing from the applicable guideline range, a district court

"must specifically articulate reasons for the *degree* of departure." **Collins**, 122 F.3d at

1309 (emphasis added); *see also United States v. Jones*, 158 F.3d 492, 505 (10th Cir.

1998). The district court may use any reasonable methodology hitched to the Sentencing

Guidelines to justify the reasonableness of the departure, including extrapolation from or

analogy to the Guidelines. But simply "articulat[ing] a factual basis for departing from

the Guideline range . . . does not automatically suffice to explain the degree of departure."

*United States v. Whiteskunk*, 162 F.3d 1244, 1253 (10th Cir. 1998).

Neither the record, the presentence report, nor the sentencing court included any

explanation or methodological basis for how or why it selected a six-level degree of

departure.[6] This "[f]ailure to clearly articulate the basis for the court's degree of

departure makes our review of reasonableness difficult if not impossible, and leaves us to

---

[6]The government asks that we infer from the record that the district court hitched its upward departure to the statutory maximum of 120 months under 18 U.S.C. § 1112(b). We decline to do so. The government's suggestion would require speculation on our part, something our case law regarding findings in this area is designed to prevent. Furthermore, such an inference appears unfounded. A six-level upward departure was not necessary to bring the defendants within a sentencing range encompassing 120 months. Indeed, in light of the defendants' respective criminal history categories, they would have fallen within such a range with the following upward departures: Gregory Checora, two levels; Reuben Cuch, three levels; Warrenell Cuch, one level; and Bobby Redcap, three levels. We thus find it difficult to presume the district court used the statutory maximum as a guidepost.

'speculate as to reasoning that might have been employed by the sentencing court to arrive at the particular sentence.'" **Id.** (quoting **United States v. Gardner**, 905 F.2d 1432, 1436 (10th Cir. 1990)).  Because the record lacks any basis upon which to determine whether the departure was reasonable, we must return this case to the district court.

## V

Finally, Warrenell Cuch challenges the district court's order that he pay $5,000 of the total restitution amount to the Utah State Division of Child and Family Services. Benjie Murray had two sons from a prior marriage, aged eight and ten years, that were in foster placement.  The expense of their upbringing was being borne by the State of Utah. Relying on the Presentence Report, the district court found that Murray had been making child support payments, presumably to Child and Family Services,[7] but that his "death eliminate[d] him as a source of financial . . . support for his sons."  The court ordered Warrenell and the other defendants to pay $5,000 to the agency to fill the void left by their criminal actions.

Warrenell Cuch argues that child support payments cannot, as a matter of law, be ordered because the child support does not constitute actual damages stemming from the commission of the crime.  To support his argument, Warrenell relies upon 18 U.S.C.

---

[7]Under Utah Statute, the agency may (and sometimes must) seek reimbursement from a minor's parent or legal guardian for services the agency has provided to the minor. *See* Utah State Code Ann. 62A-4a-114 (Michie 1997).

§ 3651 and cases interpreting that section.  ***See, e.g., Fiore v. United States***, 696 F.2d 204 (2d Cir. 1984); ***United States v. Tiler***, 602 F.2d 30 (2d Cir. 1979).  Section 3651 provides that a defendant may "be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had."  18 U.S.C. § 3651 (1984).  We review this challenge to the legality of the restitution order *de novo*, ***see United States v. Harris***, 7 F.3d 1537, 1539 (10th Cir. 1993), and conclude it has merit, albeit for reasons other than those advanced by the defendant.

We first note that Warrenell's reliance on section 3651 is misplaced.  Section 3651 was repealed effective November 1, 1987.  The statute currently in effect and applicable to this case is 18 U.S.C. § 3663A, which provides the district court shall order a defendant to make restitution to the victim of the offense.  ***See*** 18 U.S.C. § 3663A(a)(1) (Supp. III 1997).  The statute defines "victim" as any "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." ***Id.*** § 3663A(a)(2).  Benjie Murray's sons are victims within the meaning of the statute. They have been directly and proximately harmed as a result of their father's death because they have lost, among other things, a source of financial support.

Nevertheless, we conclude there is insufficient evidence in the record to uphold the district court's decision to order that the $5,000 be paid to Child and Family Services. The pertinent statute provides that if, as here, the victim is under 18 years of age, the legal guardian of the victim, another family member, or any other person appointed as suitable

by the court, may assume the victim's rights under section 3663A. *See id.* § 3663A(a)(2). The district court has made no finding that the Child and Family Services agency serves as legal guardian of the two boys; nor has the court appointed the agency as a suitable proxy.

We therefore vacate the portion of Warrenell Cuch's restitution order that requires him to pay $5,000 to Child and Family Services. The district court must reconsider that portion of the order in light of 18 U.S.C. § 3663A(a)(2). Furthermore, although this issue was raised only by Warrenell Cuch, we exercise our discretion to apply our holding to the other defendants, as they are all equally affected.

**VI**

We AFFIRM all Sentencing Guidelines determinations by the district court other than the extent of the district court's upward departure. In that regard, and in that regard only, we REMAND for specific findings. We also VACATE the portion of the defendants' restitution orders that requires them to pay $5,000 to the Utah State Division of Child and Family Services. The district court is to reconsider that portion in a manner consistent with this opinion.