**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

ANDRE IVORY,

        Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

PAMELA RENEA TYLER,

        Defendant - Appellant.

No. 06-3194

No. 06-3217

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NOS. 04-CR-20044-01-KHV and 04-CR-20044-02-KHV)**

---

Robin D. Fowler, Bath & Edmonds, P.A., Overland Park, Kansas, for Defendant - Appellant, Andre Ivory.

Kurt P. Kerns, Ariagno, Kerns, Mank & White, LLC, Wichita, Kansas, for Defendant - Appellant, Pamela Renea Tyler.

Scott C. Rask, Assistant United States Attorney, (Eric F. Melgren, United States Attorney, with him on the brief), Kansas City, Kansas, for Plaintiff - Appellee, United States of America.

---

Before **HARTZ**, **McCONNELL**, and **HOLMES**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Andre Ivory was indicted on federal drug charges after an informant, Tania Atkins, purchased crack cocaine from him on several occasions. He then proceeded to make matters worse for himself, and others, by arranging to have Atkins murdered. Fortunately, that effort failed. There followed a series of superseding indictments charging additional defendants with drug offenses and offenses related to the attempted murder. Most of the defendants entered into plea agreements, and even Mr. Ivory himself pleaded guilty to all but one of the drug charges against him. Eventually, three defendants were tried in a joint trial: Mr. Ivory; his girlfriend, Pamela Renea Tyler; and her brother, Mark McGee.

Mr. Ivory and Ms. Tyler (the Defendants) were convicted of conspiracy to kill a witness, *see* 18 U.S.C. § 1512(a)(1)(A), (k), attempting to kill a witness, *see id*. § 1512(a)(1)(A), and use of a firearm in conjunction with a crime of violence, *see id*. § 924(c)(1)(A). McGee was acquitted on all charges, the Defendants were acquitted on a charge of conspiracy to distribute cocaine, and Ms. Tyler was acquitted on a charge of distributing cocaine. Mr. Ivory was sentenced to life

imprisonment on the drug counts to which he had pleaded guilty. On the charges relating to the attempted murder, he was sentenced to 240 months' imprisonment, to be served concurrently with his sentence on the drug counts; and on the firearms charge he was sentenced to 120 months, to be served consecutively to the other sentences. Ms. Tyler was sentenced to 20 years' imprisonment on each of the three counts on which she was convicted, the terms to be served consecutively to one another.

The Defendants appeal their jury convictions on the ground that the prosecutor improperly commented on their failure to testify. They also raise challenges to their sentences, primarily arguing the insufficiency of the evidence to support various enhancements under the United States Sentencing Guidelines (USSG). Exercising jurisdiction under 28 U.S.C. § 1291, we consolidate the two appeals and affirm.

## I. BACKGROUND

Between March 18 and March 24, 2004, Atkins, an informant for the Lawrence, Kansas, Police Department, purchased crack cocaine from Mr. Ivory on five occasions. On March 25 Lawrence police officers executed a search warrant for drug evidence at the residence that Mr. Ivory shared with Ms. Tyler. That same day, officers arrested Mr. Ivory on a charge of distributing crack cocaine.

On April 29, while Mr. Ivory was still in jail, Atkins was shot while driving home from work in Lawrence. Kyle Crayton, the assailant, testified at trial that McGee had offered him money to kill Atkins. He then met with Ms. Tyler, McGee, and McGee's girlfriend, Chaconie Edwards, to plan the crime. Kim Sanders, a friend of Ms. Tyler who helped determine Atkins's whereabouts, corroborated Crayton's testimony that McGee had encouraged Crayton to participate in the murder plan and that Crayton had been assigned to kill Atkins. Edwards corroborated Crayton's testimony that she and Ms. Tyler had met with him to plan the murder. To establish Mr. Ivory's involvement, the government played tape recordings of a number of phone conversations between Mr. Ivory and Ms. Tyler while he was in jail.

## II. DISCUSSION

### A. Prosecutorial Misconduct

The recorded conversations between Mr. Ivory and Ms. Tyler do not explicitly discuss murdering Atkins. The prosecutor contended at trial that some of their language was code. In particular, he suggested in closing argument that they used the word *money* to mean the planned murder of Atkins. The attorneys for the Defendants responded that the word *money* should be taken at face value—that the two were simply concerned about the need to pay for Mr. Ivory's attorney. Counsel for McGee reiterated the point, stating, "[N]ot one witness [told] you that the reference to money is really reference to a killing. Have you

heard anybody say that other than [the prosecutor]?"  R. Vol. XIII, Doc. 508 at

163.  In rebuttal the prosecutor argued:

> Let's really get to the crux of the matter.  What does "money" mean?
> Well, the only persons that use the word "money" in those
> conversations were not witnesses that could be called by the
> Government.  The interpretation of the word "money," then, has to
> be determined based upon—

*Id*. at 169–170.  At this point, counsel for all three defendants moved for a

mistrial on the ground that the prosecutor had commented on their clients' failure

to testify.  The court denied the motion but instructed the jury that it should

disregard the prosecutor's comment, that the defendants had an absolute right not

to testify, and that the jury should not consider their silence.

On appeal the Defendants challenge the denial of the request for a mistrial.

We review such a denial for abuse of discretion.  *United States v. Gabaldon*, 91

F.3d 91, 94 (10th Cir. 1996).  In determining whether a mistrial should have been

granted, we focus on "whether the defendant's right to a fair and impartial trial

was impaired."  *Id*. at 93 (ellipses, brackets, and internal quotation marks

omitted).

The Defendants rely on well-settled law protecting a defendant from the

inference that silence at trial implies guilt.  The leading case is *Griffin v.*

*California*, 380 U.S. 609, 615 (1965).  At Griffin's trial for first-degree murder

the judge instructed the jury that it could infer the truth of evidence against him if

he failed to testify and could "reasonably be expected to deny or explain [the

evidence] because of facts within his knowledge." *Id*. at 610 (internal quotation marks omitted). The prosecutor asked the jury to draw that inference, pointing to evidence that Griffin had been seen with the victim on the evening of the murder, listing facts that he would know, and then asserting that "[t]hese things he has not seen fit to take the stand and deny or explain. And in the whole world, if anybody would know, this defendant would know. [The victim] is dead, she can't tell you her side of the story. The defendant won't." *Id*. at 611 (internal quotation marks omitted). The Supreme Court held that both the court's instructions and the prosecutor's remarks violated Griffin's privilege against self-incrimination. *Id*. at 615. As the Court later explained, "*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976). We have held that

> [t]he test . . . to determine whether the prosecutor's remark will be considered a comment on the defendant's failure to testify is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.

*United States v. Barton*, 731 F.2d 669, 674 (10th Cir. 1984) (internal quotation marks omitted).

There is, however, an important limitation on this doctrine. If a statement by the prosecutor that might otherwise be construed as a comment on a defendant's failure to testify is a fair response to an argument by a defendant, we

-6-

are unlikely to find error.  This proposition was adopted by the Supreme Court in *United States v. Robinson*, 485 U.S. 25 (1988).  In that case defense counsel had argued that the government had not allowed the defendant to give his side of the story.  In response the prosecutor pointed out that the defendant "'could have taken the stand and explained it to you . . . .'"  *Id*. at 26.  The Court held that the defendant's right not to testify was not infringed.  It reasoned:

> [I]t is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another.  The broad dicta in *Griffin* to the effect that the Fifth Amendment, "forbids . . . comment by the prosecution on the accused's silence," must be taken in the light of the facts of that case.  It is one thing to hold, as we did in *Griffin*, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence.  There may be some "cost" to the defendant in having remained silent in each situation, but we decline to expand *Griffin* to preclude a fair response by the prosecutor in situations such as the present one.

*Id*. at 33–34 (citation omitted).

We think that *Robinson* controls this case.  After defense counsel stated that no witness had testified that *money* was a code word for the murder plot, the prosecutor could fairly point out that the only persons who used the term *money* in the recorded conversations "were not witnesses that could be called by the Government," and therefore "[t]he interpretation of the word 'money' has to be determined based upon—."  R. Vol. XIII, Doc. 508 at 169–170.  Not only would

it be "unfair" to forbid the prosecutor to explain why the government produced no witness who could testify to what the Defendants meant in their conversations, but the context of the prosecutor's remark in itself lessened the danger that the jury would infer guilt from silence. To be sure, the prosecutor's remark referred to the failure of the Defendants to testify, but the remark's purpose was not to encourage the jury to infer guilt from silence by suggesting that a defendant who does not testify must have something to hide. Rather, the clear intent was to explain why the jury must rely on circumstantial evidence to interpret the recorded conversation. Indeed, the prosecutor did not even suggest that the failure of the Defendants to testify must mean that the word *money* referred to the planned murder. Because the prosecutor focused on a proper inference to draw from the Defendants' silence— the need to use other evidence to interpret their conversations—the jury was less likely to consider other (improper) inferences that might be drawn. Moreover, the district court's instruction to the jury, which we assume that the jury tried to obey, *see United States v. Templeman*, 481 F.3d 1263, 1266 (10th Cir. 2007), further reduced the danger that the jury would infer guilt from silence. We do not mean to suggest that absent defense counsel's argument (that the government had not produced witnesses to declare the meaning of the word *money*), the government's comment would have been acceptable, even with the district court's instruction. But the lessened potential for unfair

prejudice to the Defendants reinforces our view that the prosecutor's response was permissible.

Further supporting our conclusion are opinions from our sister circuits. In *United States v. Beverly*, 369 F.3d 516, 543–44 (6th Cir. 2003), defense counsel argued that if the defendant had committed the robberies with which he was charged, he would not have stayed in the area. As counsel put it: "'[T]he government says this man robbed four banks, he stuck around Columbus for five years, he waited as his buddies . . . made deals, ignored [the government's] offer and then counted on twelve white folks to set him free.'" *Id*. at 544. The prosecutor responded, "We found another interesting concept of the law is if you don't run, you are not guilty. Ladies and gentlemen, why [the defendant] did what he did, only he can answer. But he figured probably he didn't get arrested in '95 or '96, so he was okay, that these guys haven't snitched on him." *Id*. at 543–44. The circuit court affirmed the conviction because the prosecutor's remark, although indirectly referring to the defendants' failure to testify to his motive for not fleeing, was a proper response to defense counsel's argument.

*United States v. Isaac*, 134 F.3d 199 (3d Cir. 1998), is similar. Isaac was charged with transporting marijuana in a boat from Jamaica to St. Thomas in the Virgin Islands. To prove the charge, the government relied on the testimony of two confederates, Brown and Reid. (A fourth person involved in the drug shipment had been left behind in Jamaica.) During closing argument Isaac had

attacked the credibility of the two witnesses, who apparently did not possess

sterling characters. The prosecutor explained to the jury that his two witnesses

were the best he could do:

> Raymond Isaac captained that boat from Jamaica, and the only
> people who would know that Raymond Isaac captained that boat from
> Jamaica are Raymond Isaac, Conrad Brown, Irvin Reid, and the
> fourth individual in Jamaica. Those are the only people.

*Id*. at 206 (internal quotation marks omitted). On appeal Isaac argued that the

prosecutor had implied that Isaac's failure to testify was evidence of his guilt.

Relying on *Robinson*, the court rejected the argument, even though the

prosecutor's statement came "close to violating *Griffin*." *Id*. It reasoned:

> Much of [defendants'] argument was an attack on the credibility of
> Brown and Reid, whose testimony was key to proving numerous
> elements of the government's case. The prosecutor began his
> rebuttal by conceding that Brown and Reid were probably not the
> most upstanding individuals; however, there were no paragons of
> virtue present during the smuggling operation who could testify
> about it. In this context, the prosecutor's declaration . . . comes
> across as an assertion that the government obtained its evidence from
> the only available sources.

*Id*. at 207. Here, likewise, the prosecutor was trying to explain that the only

available sources for proving the meaning of *money* were circumstantial evidence.

*Cf. United States v. Virgen-Moreno*, 265 F.3d 276, 291-92 (5th Cir. 2001)

(prosecutor's comment that the defendant had failed to call family members as

witnesses to explain tape-recorded conversations was an appropriate response to

statement by defense counsel that the government had not called scientific experts

to identify the voices on the recordings); *United States v. Coleman*, 349 F.3d 1077, 1087–88 (8th Cir. 2003) (prosecutor's comment that a particular witness not called by the government could have exercised her privilege against self-incrimination was a fair response to defendant's suggestion that the government should have called the witness).

The Defendants' reliance on *Berryman v. Colbert*, 538 F.2d 1247 (6th Cir. 1976), is misplaced. In that case the government made five comments regarding the defendant's failure to testify, including the following:

> All right. Now, finally, to establish the robbery murder, the felony murder, we are relying almost entirely upon circumstantial evidence. Nobody was there when the robbery took place. Nobody that we can bring here to testify. *The defendants here, yes, but we can't get them to testify.* So, it is a matter of relying upon physical facts that were described to you by the police officer, and from those physical facts, then you must make an inference, you must say, beyond a reasonable doubt certain things did happen.

*Id.* at 1249 (internal quotation marks omitted). The Sixth Circuit concluded that this argument, particularly the italicized sentence, was "in square violation" of *Griffin*. *Id.* at 1250. But the prosecutor in that case had not been responding to an argument by defense counsel. *Berryman*, which was decided before *Robinson*, therefore had no occasion to consider the issue that was decisive in *Robinson* and is therefore distinguishable on that ground from the case before us.

Finally, Ms. Tyler argues that the prejudicial impact on *her* of the prosecutor's comment cannot be justified by any need to respond to the comment

-11-

by counsel for *McGee*. But that comment concerned an element of the case against all three defendants at trial, so the prosecutor could not have responded in a manner that related only to McGee. It does not matter which defense counsel made the comment or whether all defense counsel had agreed to divide up their arguments and assigned a particular attorney to make the comment. *Cf. United States v. Martinez-Larraga*, 517 F.3d 258, 267–69 & n.8 (5th Cir. 2008) (prosecutor's reference to defendants' post-arrest silence was proper response to argument by counsel for one of the defendants). We hold that the prosecutor's comment did not deprive the Defendants of a fair trial and therefore denial of the motion for a mistrial was not an abuse of discretion.

## B.    Sentencing

The Defendants contend that there was insufficient evidence to support the district court's imposition of the following enhancements in calculating their offense levels under the Sentencing Guidelines:  (1) a four-level enhancement for the offer of money to kill a witness, *see* USSG § 2A2.1(b)(2); (2) a four-level enhancement for their leadership roles in the murder conspiracy and a two-level enhancement to Mr. Ivory's sentence for his role on the drug counts, *see id.* § 3B1.1(a), (c); (3) an enhancement to Mr. Ivory's sentence based on the district court's drug-quantity calculation, *see id.* § 2D1.1(a)(3); (4) a two-level enhancement to Ms. Tyler's sentence for restraint of the victim, *see id.* § 3A1.3; (5) a two-level enhancement to Ms. Tyler's sentence for the use of juveniles in

the murder conspiracy, *see id*. § 3B1.4; and (6) a two-level enhancement to Ms. Tyler's sentence for obstruction of justice, *see id*. § 3C1.1 (2004). Ms. Tyler also contends that the district court's use of the preponderance-of-the-evidence standard in determining the appropriate Guidelines range violated her rights under the Sixth Amendment, that the district court failed to give proper consideration to sentencing disparities, and that the discrepancy between her sentence and the statutory penalty for attempted murder makes her sentence unreasonable.

### 1.    Preponderance-of-the-Evidence Standard

Because of its potential impact on the other sentencing issues raised on appeal, we first address Ms. Tyler's contention that the district court's use of the preponderance-of-the-evidence standard in determining the appropriate Guidelines range violated her Sixth Amendment rights. She relies on *United States v. Booker*, 543 U.S. 220 (2005), and *Cunningham v. California*, 549 U.S. 270 (2007), which held that contested factual predicates for increasing a sentencing range under mandatory guidelines must be found by a jury beyond a reasonable doubt. We have held, however, that these holdings do not apply to advisory guidelines, such as the federal Sentencing Guidelines. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1130 (10th Cir. 2006) (even after *Booker*, district court calculating Guidelines sentencing range "may continue to find facts by a preponderance of the evidence" because court "applies such facts in a discretionary manner"); *United States v. Ellis*, 525 F.3d 960, 965 (10th Cir. 2008)

-13-

(distinguishing *Cunningham* on the ground that it concerned a mandatory, rather than an advisory, sentencing scheme). We therefore reject this contention. Accordingly, our standard of appellate review is the same as before *Booker*. We review "factual findings for clear error, reversing only if a finding is wholly without factual support in the record, or after reviewing the evidence, we are definitively and firmly convinced that a mistake has been made." *Rodriguez-Felix*, 450 F.3d at 1130. We review de novo any claims of legal error. *Ellis*, 525 F.3d at 964. We address the remaining challenges below and reject them all.

### 2. Offer of Money to Commit Murder

USSG § 2A2.1(b)(2) provides: "If the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by 4 levels." The district court applied this enhancement based on (1) Crayton's testimony that McGee had offered him money to murder Atkins and (2) a phone conversation between Ms. Tyler and Mr. Ivory from which it inferred that they were complicit in McGee's offer to Crayton. Although the Defendants point out weaknesses in the evidence relied on by the court, the court's finding had adequate evidentiary support.

### 3. Leadership Roles in the Offenses

USSG § 3B1.1 states:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The commentary to § 3B1.1 provides the following guidance for determining which enhancement is appropriate:

In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

*Id.*, cmt. n.4. The Defendants challenge the four-level enhancement for their roles in the murder conspiracy and Mr. Ivory challenges the two-level enhancement on the drug counts.

There is no dispute that the murder conspiracy involved at least five participants. But Mr. Ivory contends that "[t]he evidence . . . did not establish that [he] gave directions to anyone regarding any plot to kill Tania Atkins" and

-15-

that his conversations with Ms. Tyler did not "constitute being an organizer or leader." Ivory Br. at 42. We disagree. The district court could properly determine that Mr. Ivory was a leader based on his phone calls with Ms. Tyler, in which, it could be inferred, he pressured her to carry out the plan to kill Atkins and discussed with her both who could be chosen to perform the murder and the best time of day for the crime. After all, he was the one who would benefit most from the murder. As for Ms. Tyler, she claims that she was merely a manager of the murder conspiracy and that she therefore should have received only a three-level enhancement for her role. But the court reasonably found that she was the "pivot point" of the conspiracy. R. Vol. VII, Doc. 502 at 15:10.

Turning to the drug charge against Mr. Ivory, it involved fewer than five participants, so § 3B1.1(c) applied. Under that provision the defendant "needs merely to give some form of direction or supervision to someone subordinate in the criminal activity for which the sentence is given." *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cir. 1990) (defendant was a supervisor under USSG § 3B1.1(c) because he supervised another person, a doorman, in a drug-distribution scheme). The district court based this enhancement on Cheek's testimony that she called Mr. Ivory to purchase drugs and Mr. Ivory sent a person to deliver drugs to her at a convenience store. Although Mr. Ivory contends that "[t]here was no evidence as to what the respective roles were between [Mr. Ivory] and [the delivery person]," Ivory Br. at 40, the court could reasonably believe

Cheek's testimony and find that Mr. Ivory had directed a subordinate to make the delivery.

### 4. Drug Quantity Calculation

Mr. Ivory's sentence on the drug charges to which he pleaded guilty was based on the quantity of drugs involved in this criminal activity. *See* USSG § 2D1.1(a)(3). The district court found that quantity to be 170.1 grams of crack cocaine and therefore calculated an offense level based on at least 150 grams of crack cocaine. *See id.* § 2D1.1(c)(3). Of the total 170.1 grams, 102 grams was attributed in the presentence investigation report (PSR) to Mr. Ivory's sales to Cheek. On appeal Mr. Ivory contends only that Cheek's testimony does not support a finding of 102 grams but a "drug amount closer to 70 than 100 grams." Ivory Br. at 39. Reducing the 102 grams to 70 grams would reduce the 170.1 gram total to 138.1 grams, which is about 12 grams below the 150-gram threshold for the enhancement imposed by the court.

In our view, the evidence supported the district court's choice of the offense level. The court could reasonably view the PSR calculation as a conservative estimate; and the court further observed that the PSR had not relied on drug transactions referred to in Ms. Tyler's grand jury testimony, which could "offset" a reduction for any excess in the PSR calculation (by accounting for at least 12 grams). R. Vol. II, Doc. 486 at 84. We note that Mr. Ivory raises no challenge on appeal to the district court's reliance on Ms. Tyler's testimony. The

-17-

district court's attribution to Mr. Ivory of at least 150 grams of crack cocaine was not clearly erroneous.

### 5. Restraint of the Victim

USSG § 3A1.3 provides a two-level increase in the offense level for any offense when "a victim was physically restrained in the course of the offense." The commentary to section 1B1.1 defines *physically restrained* as "the forcible restraint of the victim such as by being tied, bound, or locked up." *Id*. § 1B1.1, cmt. n.1(K). The examples in the commentary are illustrative but not exhaustive. *See United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir. 1990).

At trial Crayton testified that he drove a stolen car to Atkins's place of work in Lawrence, rammed the stolen vehicle into the front of her van as she was leaving work, and shot at her through her windshield as she tried to back up. (Fortunately, his gun jammed so he had to flee—in Edwards's nearby car—without accomplishing his task.) The district court ruled that Atkins was physically restrained during the offense:

> Crayton carried out this attempted murder by forcibly restraining the victim by blocking her car so that she could not escape while he shot at her and he intentionally rammed the stolen Oldsmobile into her mini van. And in doing so, temporarily prevented her from continuing on her way home from work or from escaping in the attack.

R. Vol. VII, Doc. 502 at 9.

On appeal Ms. Tyler does not challenge the underlying facts but argues, in essence, that Atkins was not physically restrained because she was not chased and tackled, as in *United States v. Checora*, 175 F.3d 782, 790 (10th Cir. 1999) (victim physically restrained within the meaning of § 3A1.3 when two defendants chased and tackled him to prevent his escape). But *Checora* stated that restraint occurs when "the defendant's conduct . . . ke[pt] the victim within bounds or under control." *Id.* at 791. In this case the record supports a finding that the purpose of ramming Atkins's vehicle was to trap or immobilize her; because she could not move forward, Crayton could more readily shoot her. She was being kept "within bounds or under control" to make her a better target. We find no error in the district court's decision to impose the two-level enhancement.

### 6. Use of Juveniles

USSG § 3B1.4 provides, "If the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels." The commentary to § 3B1.4 defines "used or attempted to use" to include "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting," *see id.*, cmt. n.1. Ms. Tyler challenges the district court's finding that she had enlisted the help of two juveniles—Martinez and Cortez—in the murder conspiracy, contending that (1) the court erred in applying this enhancement because there was no evidence regarding their ages; and (2)

even though Martinez and Cortez had assisted in transporting to Lawrence the stolen car used by Crayton when shooting at Atkins several days later, the enhancement does not apply because transporting the vehicle was not part of the offense.

On the first point, contrary to the assertion in her appellate brief, Ms. Tyler did not object in district court to the PSR's statements regarding the ages of Martinez and Cortez. The court therefore could properly deem the ages to be admitted. *See United States v. Tindall*, 519 F.3d 1057, 1061–62 (10th Cir. 2008).

As for the juveniles' role in the conspiracy, Martinez and Cortez were needed because Crayton refused to drive the stolen car from Ms. Tyler's house in Kansas City, Kansas, to Lawrence, where Atkins was to be killed. In *United States v. Tran*, 285 F.3d 934, 937–38 (10th Cir. 2002), we held that the defendants had "used" a juvenile to commit bank fraud when they had employed a 16-year-old driver to transport them from the airport to local banks, where the defendants cashed counterfeit checks. Here, two juveniles, at Ms. Tyler's request, facilitated the offense by transporting the stolen vehicle to a more convenient location for use in the murder plan. The district court properly applied § 3B1.4.

### 7. Obstruction of Justice

USSG § 3C1.1 (2004) provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The enhancement applies to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id.*, cmt. n.4(a). On appeal Ms. Tyler contends that the enhancement cannot be sustained on the basis of testimony at sentencing by Detective Scott Bonham regarding various incidents. But the district court imposed the two-level enhancement based on Edwards's trial testimony that Ms. Tyler had threatened her; it did not rely on Bonham's testimony. Ms. Tyler does not dispute the sufficiency of Edwards's testimony to support the enhancement. Because Ms. Tyler does not challenge the sufficiency of the evidence actually relied upon by the district court, she is not entitled to relief.

### 8.    Consideration of Sentencing Disparities

Ms. Tyler challenges the procedural reasonableness of the district court's sentence, contending that it failed to give proper consideration to the disparity between similarly situated defendants, as required by 18 U.S.C. § 3553(a)(6). But § 3553(a)(6) does not require the sentencing court to compare the sentences of codefendants; rather, it looks to uniformity on a national scale. *See United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2008). Moreover, a sentencing court is not

required to provide a specific discussion of the § 3553 factors for a sentence falling within the range suggested by the Guidelines. *See United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1202 (10th Cir. 2007). All that is required is that the court provide "a general statement noting the appropriate guideline range and how it was calculated." *Id.* (internal quotation marks omitted). We are satisfied that the district court did this. As we stated in *United States v. Verdin-Garcia*, 516 F.3d 884, 898 (10th Cir. 2008):

> [I]t is not enough to say, as Appellants do here, that the court failed for instance to discuss the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty [of] similar conduct. Appellants must have raised a nonfrivolous argument below showing, by more than hand-waving or conclusory statements, the likelihood of a sentencing disparity if the Guidelines were followed. This they did not do.

(citation and internal quotation marks omitted). Ms. Tyler failed to make such a showing; indeed, she did not complain in district court about a sentencing disparity. Therefore she is not entitled to relief.

### 9. Discrepancy Between Guidelines and Statutory Penalty

Ms. Tyler contends that the district court's sentence is "presumptively *unreasonable* because application of the enhancements far exceed the potential punishment Congress intended to impose for [her] offense." Tyler Br. at 43. She further contends that "[i]f the maximum penalty by statute is 20 years and yet the guidelines sentence is life, then it seems that guidelines are presumptively

unreasonable since they more than triple the punishment authorized by statute."[1]

*Id*. We disagree. To begin with, Ms. Tyler's sentence (on her conviction of three offenses, not just the attempted murder) is 60 years, not life. More importantly, there is nothing presumptively unreasonable about imposing consecutive sentences to reach a sentence within the Guidelines range. On the contrary, a sentence within the Guidelines range is presumptively reasonable. *See United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). Of course, if the Guidelines range exceeds the statutory maximum, the statute must prevail. But if the defendant has been convicted of several offenses, it is hardly unreasonable to stack the statutory sentences to reach a presumptively reasonable Guidelines sentence. *See* USSG § 5G1.2(d) (providing for consecutive sentences to produce combined sentence equal to advisory Guidelines sentence). We discern no error.

## III. CONCLUSION

We AFFIRM the convictions and sentences of Mr. Ivory and Ms. Tyler.

---

[1]A 2008 amendment to 18 U.S.C. § 1512(a)(3)(B)(ii) struck "20 years" and inserted "30 years" as the maximum punishment for attempted murder of a witness. Court Security Improvement Act of 2007, Pub. L. No. 110-177, § 205, 121 Stat. 2537 (2008).