**UNITED STATES of America,**
**Plaintiff,**

v.

**Redd Rock SERAWOP, Defendant.**

**United States of America, Plaintiff,**

v.

**Levangela Bedonie, Defendant.**

**Nos. 2:03–CR–00339 PGC,**
**2:02–CR–00690 PGC.**

United States District Court,
D. Utah,
Central Division.

Feb. 18, 2004.

---

**1260**

Felice J. Viti, Salt Lake City, Utah, for Plaintiff.

Fred Metos, Salt Lake City, Utah, for Defendants.

## ORDER APPOINTING EXPERT ON POSSIBLE LOST INCOME RESTITUTION

CASSELL, District Judge.

The court has before it two homicide cases in which the same issue regarding possible restitution for lost income has arisen. In *United States v. Serawop,* the defendant was found guilty by a jury of voluntary manslaughter while within Indian Country. The victim in that case was Beyonce Serawop, a three-month-old baby. Defendant Serawop, frustrated by his baby daughter's crying, "lost it" and threw the child into a sink or toilet, killing her.[1] In *United States v. Bedonie,* the defendant pled guilty to involuntary manslaughter. She was drinking beer while driving a car in a reckless manner. She crashed the car, killing Mr. Brian Johnson, a passenger. Mr. Johnson was a promising young artist who had recently graduated from high school. He provided financial support to his impoverished mother.

Both of these cases present the issue of whether the court should order restitution "for income lost by such victim as a result of such offense" under the Mandatory Victim Restitution Act (MVRA)[2] or, if that statute is inapplicable, the Victim Witness Protection Act.[3] Because the two cases present a parallel legal issue, the court has associated them for purposes of briefing and argument.

To assist the court in calculating lost income in these cases, the court believed it might be desirable to receive the views of an expert in financial loss calculations. The court is authorized to appointed its own expert by both Rule 706 of the Federal Rules of Evidence[4] and by its inherent "general power of calling witnesses in aid of justice."[5] In addition, the court has power to appoint a "special master" to resolve issues regarding restitution.[6] The court intends to invoke its powers under all these authorities in this order and to rely on the fact that Congress has forbidden any restriction on the kind of information that the court can receive for sentencing purposes.[7]

The court gave notice to the parties in both cases that it was considering appointing an expert on lost income, as required by Rule 706, and invited the parties to raise any concerns or to nominate possible experts. The court has now received objections from both the defendant and the government in *Serawop* and from both the defendant and the government in *Bedonie.*

---

1. Draft Presentence Report, ¶ 11.

2. 18 U.S.C. § 3663A(b)(2)(C).

3. 18 U.S.C. § 3663(b)(2)(C).

4. Fed.R.Evid. 706; *see also* Fed.R.Crim.P. 28, Adv. Comm. Note 1972 Amendments.

5. *See* McCormick on Evidence § 8 at 17 (3rd ed.1984) (collecting authorities); *see also* 2 Wigmore § 563; 9 *id.* § 2484. *See generally Scott v. Spanjer Bros., Inc.,* 298 F.2d 928, 930 (2nd Cir.1962).

6. 18 U.S.C. § 3664(d)(6).

7. *See* 18 U.S.C. § 3661.

The court finds these all objections unpersuasive and appoints Paul Randle as an expert on possible lost income in both of these cases.

### I. Defendant Serawop's Objections to *Sua Sponte* Appointment of an Expert

■ Defendant Serawop has been capably represented throughout these proceedings and has filed a substantial objection to the appointment of an expert. Serawop maintains that the court lacks the authority to *sua sponte* request determination of specific restitution issues, such as lost income. Serawop contends that under the statute governing the issuance of restitution orders—18 U.S.C. § 3664—the "only" persons who can request restitution are (1) the probation officer and (2) the prosecutor. Because lost income was not included in the initial, draft pre-sentence report and because the prosecutor has not requested lost income restitution in his case, Serawop maintains that the court is foreclosed from considering lost income for Beyonce.

Serawop's argument flies in the face of the structure of the restitution statutes. Because Serawop's manslaughter conviction (like Bedonie's conviction for involuntary manslaughter) is plainly a "crime of violence," any restitution in his case is covered by the *Mandatory* Victims Restitution Act of 1996.[8] Because of the MVRA's importance here, a brief review of the statute's background may be helpful.

### The MVRA

■ Historically, the federal criminal justice system was largely unconcerned with compensating victims of crime.[9] Victims had to file separate civil suits to obtain monetary compensation. All this changed in 1982 with enactment of the Victim and Witness Protection Act, which permitted federal judges to order certain convicted offenders to pay restitution to their victims. The legislative history of the VWPA indicates that Congress "intended to enact a victim compensation scheme to restore the victim to his or her prior state of well-being to the highest degree possible."[10]

Despite the innovations made in the VWPA, crime victims continued to believe they were not receiving restitution frequently enough. In 1995, the Senate Judiciary Committee held hearings on the subject, during which victims' advocates urged mandatory restitution. For example, David Beatty of the National Victim Center argued: "Our nation's long history of jurisprudence and legal tradition would seem to demand that victims be granted restitution as a matter of right. To leave the question as to whether or not a debt is owed to the discretion of any individual criminal justice official is contrary to one of our nation's most basic notions of justice and fair play."[11]

Defenders of discretion also testified at the hearing. For example, Judge Maryanne Trump Barry appeared for the Judicial Conference of the United States,

8. Pub.L. 104–132, Title II, § 201, Apr. 24, 1996, 110 Stat. 1227, *codified in* 18 U.S.C. § 3663A.

9. Note, *A Statutory Chamaeleon: The Mandatory Victim Restitution Act's Challenge to the Civil/Criminal Divide*, 86 Iowa L.Rev. 1013, 1014 (2001).

10. *United States v. Hill*, 798 F.2d 402, 405 (10th Cir.1986) (*citing* S.Rep. No. 97–532, 97th

Cong., 2d Sess. 30, *reprinted in* 1982 U.S.C.C.A.N. 2515, 2536).

11. *Mandatory Victim Restitution: Hearing on S.173 Before the Senate Comm. on the Judiciary*, November 8, 1995 (testimony of David Beatty, Director of Public Policy National Victim Center), *available at* 1995 WL 11869373.

expressing concern that compulsory requirements "would significantly alter current victim restitution law and practice, replacing a flexible system, based on common sense and judicial discretion, with an inflexible, mandatory system which will not only be extremely expensive to implement, but will negatively impact on the war on crime."[12]

Congress largely agreed with the advocates of mandatory restitution and passed the MVRA. The MVRA's primary purpose, the Tenth Circuit recently explained, "is to force offenders to 'pay full restitution to the identifiable victims of their crimes.'"[13] Thus, the Act unequivocally directs that "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of [*inter alia*, a crime of violence] ... the court *shall* order ... that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate."[14]

Under the MVRA, there can be no doubt that the court is *required* to order restitution for losses covered by the statute. For homicide cases, funeral expenses are clearly covered,[15] and the court has asked the parties to brief and argue whether additional losses—such as lost income—are covered as well. If the court were to conclude the restitution for lost income is required by the MVRA, then the court would need to follow the MVRA's restitution procedures spelled out in 18 U.S.C. § 3664.[16]

Under § 3664, the court is required to direct the probation officer to collect information necessary to prepare a restitution order and to include that information in the pre-sentence report.[17] Upon request from the probation officer, the prosecutor is required to consult "to the extent practicable" with "all identified victims" and provide the probation officer with "a listing of the amounts subject to restitution."[18] Then the probation officer provides notice to all victims of amounts that will be listed in the presentence report as subject to restitution and give the victims an opportunity to submit information about restitution and notice of the date when the sentencing hearing will take place.[19]

Once the report is prepared and submitted to the court, "the court may require additional documentation or hear testimony."[20] The court may also set a day for a "final determination of the victim's losses" of not more than 90 days after sentencing.[21] The court is also given the power to refer any issues regarding restitution orders to a magistrate judge or a special master.[22]

### The Court's Power to Investigate Restitution.

In light of the mandatory nature of the MVRA and the implementing procedures

12. *Mandatory Victim Restitution: Hearing on S.173 Before the Senate Comm. on the Judiciary,* November 8, 1995 (Statement of Judge Maryanne Trump Barry, United States District Judge and Chair of the Committee on Criminal Law, Judicial Conference of the United States), *available at* 1995 WL 11869324.

13. *United States v. Reano,* 298 F.3d 1208, 1211 (10th Cir.2002) (*quoting* S.Rep. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925).

14. 18 U.S.C. § 3663A(a)(1) (emphasis added).

15. 18 U.S.C. § 3663A(b)(3).

16. *See* 18 U.S.C. § 3663(d) (directing application of § 3664).

17. 18 U.S.C. § 3664(a).

18. 18 U.S.C. § 3664(d)(1).

19. 18 U.S.C. § 3664(d)(2).

20. 18 U.S.C. § 3664(d)(4).

21. 18 U.S.C. § 3664(d)(5).

22. 18 U.S.C. § 3664(d)(6).

of § 3664, Serawop's objection that only the probation officer or the prosecutor can request restitution makes no sense. Placing such restrictions on the MVRA would circumvent the core idea behind the statute—"to force offenders to 'pay full restitution to the identifiable victims of their crimes.'"[23] To allow probation officers or prosecutors to somehow override the needs of crime victims and block the court from considering restitution conflicts with that mandate.

Moreover, on close examination of the statutory scheme, neither a request from the probation officer nor from the prosecutor is required for the court to impose restitution. The objection that only the probation officer can request restitution can be quickly dispatched. It is well-settled that "[t]he probation officer acts as an *agent of the court* for the purpose of gathering and classifying information and informing the court in the exercise of its sentencing responsibility."[24] Thus, the probation officer works for the court—not the other way around. Accordingly, if the court believes that a possible approach to restitution ought to be investigated, the probation officer must undertake the investigation.

The objection that a prosecutor must request restitution is likewise unfounded. As will be discussed in the next section of this opinion, prosecutors are certainly empowered (if not, indeed, required) to pass along restitution information to the probation officer. But prosecutorial action is no prerequisite. To be sure, § 3664 first re-

quires the probation officer to collect from the prosecutor whatever information the government has relevant to restitution.[25] But after that, the probation officer must give the victim notice of her opportunity to submit to the court "a *separate* affidavit" regarding restitution[26]—i.e., an affidavit separate from the prosecutor's information. If the statute were not already plain enough, it goes on to provide that "[a]fter reviewing the report of the probation office, *the court* may require *additional* documentation or hear testimony"[27]—i.e., additional documentation apart from the prosecutor's. Finally, victims of violent crimes are allowed to allocate directly to the court at the sentencing hearing.[28] The statutorily-recognized rights of crime victims to provide their own restitution information to the court and of the court to collect "additional documentation" regarding restitution would make no sense if prosecutors wielded a veto over ultimate restitution orders. Furthermore, the court has its own independent obligations to discharge under the MVRA. Congress has directed that the court "shall" order restitution of certain specified losses.[29] The court cannot be blocked from the discharge of *its* duty to fashion an appropriate restitution order by prosecutors' decisions.

Indeed, as the court reads the MVRA, not even a request from a victim is necessary to trigger a restitution order. Nowhere does either the MVRA or its procedural implementing statute (§ 3664) condition a restitution order upon a vic-

---

**23.** *Reano,* 298 F.3d at 1211 (*quoting* S.Rep. No 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925).

**24.** *United States v. Rogers,* 921 F.2d 975, 980 (10th Cir.) (emphasis added), *cert. denied,* 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990).

**25.** 18 U.S.C. § 3664(d)(1).

**26.** 18 U.S.C. § 3664(d)(2)(vi) (emphasis added).

**27.** 18 U.S.C. § 3664(d)(4) (emphases added).

**28.** Fed.R.Crim.P. 32(c)(3)(E).

**29.** 18 U.S.C. § 3663A(a).

tim's request. To the contrary, the statute's mandatory terms direct restitution whenever the court sentences a violent criminal. The logic behind this decision is understandable. Victims of violent crime may be psychologically or physically unable to complete affidavits or otherwise take legal steps to secure restitution. Moreover, they may be reluctant to assert themselves into a criminal proceeding and possibly suffer retaliation from a dangerous defendant or his accomplices. Rather than create a burden for crime victims, Congress required the courts to act. Thus, the MVRA applies to all violent crimes "in which an *identifiable* victim" has been injured [30]—not all violent crimes in which a self-identified victim comes forward. To be sure, nothing requires a crime victim to accept restitution that the court may order. Some victims of crimes of violence, for understandable reasons, may believe restitution is "blood money" or is otherwise tainted. But the court must order restitution, allowing victims to decide whether to accept the money or to leave it in the federal treasury.

The conclusion that victims need take no action to secure restitution is underscored by the obvious yet tragic fact that homicide victims cannot protect their own rights. If the MVRA is triggered only by a victim's request, it might be inapplicable to *the* most serious violent crimes—those in which a criminal has taken a human life. Yet Congress intended the MVRA to cover murders. In opening hearings regarding the MVRA, Senator Hatch expressed his concern that judges ordered restitution in "only 20.2% of federal criminal cases during fiscal year 1994 ... [including] 27.9%

of all murders...." [31] Implementing the congressional decision to extend restitution to homicide case, the MVRA requires restitution for "the victim of the offense or, *if the victim is deceased, ... the victim's estate.*" [32]

For all these reasons, the court reads the MVRA and § 3664 as requiring the court, where possible, to identify a victim and the victim's awardable restitution—without regard to actions by the probation officer, the prosecutor, or even the victim. To be sure, the court must respond appropriately to the actions of others. Thus, if the probation officer has not included information in the presentence report that would support restitution, the court must give defense counsel a reasonable opportunity to respond to any other information that might support restitution.[33] Similarly, the failure of a prosecutor to seek restitution may demonstrate that restitution is inappropriate. Indeed, in this district, where the United States Attorney's Office has a highly capable, specialized victim/witness unit, only rarely will the court consider restitution above the amounts that the prosecutor has suggested. Finally, the failure of a victim to affirmatively seek restitution may have consequences. It may be that without information from a victim, the court will end up lacking sufficient evidence for such an award. But none of these concerns are applicable to the issue before the court today: whether to appoint a lost income expert. Accordingly, none of defendant Serawop's objections to the appointment have merit.

**30.** 18 U.S.C. § 3663A(c)(1)(B) (emphasis added).

**31.** *Mandatory Victim Restitution: Hearing on S.173 Before the Senate Judiciary Committee,* November 8, 1995 (Statement of Senator Orrin Hatch), *available at* 1995 WL 11869323.

**32.** 18 U.S.C. § 3663A(a)(1) (emphasis added).

**33.** *See* Fed.R.Crim.P. 32(i)(1)(C) (made applicable to restitution hearings by 18 U.S.C. § 3664(c)).

## II. Defendant Bedonie's Objections

Defendant Bedonie has also been capably represented throughout her case. Bedonie's counsel joins in the objections raised by defendant Serawop and, for the same reasons given above, the court rejects those objections.

Bedonie also argues that "there is no person who would qualify under the statutory definition of 'victim' to recover the lost future income of Brian Johnson." [34] Apparently what is meant by this claim is that the "victim" under the MVRA is Mr. Johnson's estate which, in Bedonie's view, "is determined and fixed at the time of his death.... Accordingly, the estate does not anticipate any future income because its scope is already fixed." [35]

The court will defer final decision on this issue until full briefing on the scope of the MVRA. At this juncture, however, this argument fails to provide a reason against *investigating* possible lost income. The court would like information on what the scope of Mr. Johnson's estate was at the time of his death. The court understands that typically lost income is considered part of the defendant's estate. Moreover, it is unclear that the only remaining "victim" of the defendant's crime is Mr. Johnson's estate. It may well be that Ms. Johnson (Brian Johnson's mother) herself qualifies as a "victim" under the MVRA. This conclusion would appear to be supported by the Tenth Circuit's decision in *United States v. Checora*.[36] There, the Circuit concluded that young sons whose father was murdered were also "victims" within the meaning of the MVRA, explaining that the sons "have been directly and proximately harmed as a result of their father's death because they have lost, among other things, a source of financial support." [37] In future briefing, Bedonie's counsel should distinguish the *Checora* case or otherwise explain how it can be reconciled with her position. But pending that further briefing, the court finds no good reason for delaying appointment of a expert to investigate possible lost income.

Bedonie also raises technical objections regarding the timing of the court's order. Those objections are without merit for reasons explained in a separate order.

## III. The Government's Objections

The prosecutors in both of these cases have exhibited great attention to victims' issues. The court was, therefore, surprised to receive an objection from the government to any appointment of an expert on lost income. In *Serawop*, the government argues that calculating lost income for Beyonce—who was only three-months old when killed by the defendant—would be "simply too speculative." In *Bedonie*, the government advances the parallel argument that Mr. Johnson's periodic employment and unemployment makes any lost income award to his estate "simply too speculative."

### Lost Income Awards for Homicide Victims are Not Necessarily Speculative

■ The court respectfully disagrees with the government's position that lost income for Beyonce and Mr. Johnson would necessarily be speculative. The court is merely planning to appoint an expert to determine *whether* sufficient evidence exists to support a lost income award and, if so, what the amount of that award should be. To conclude that the award would be "speculative" before looking at the evidence truly places the cart before the horse.

---

34. Defendant Bedonie's Objection to Appointment of Expert at 1–2.

35. *Id.* at 2.

36. 175 F.3d 782 (10th Cir.1999).

37. *Id.* at 795.

With respect to Beyonce's lost income in particular, many courts have found sufficient evidence to award lost income to young children in civil cases.[38] These decisions have necessarily rejected the government's position that such an award would be "speculative." Illustrative on this point is the West Virginia Supreme Court's recent holding in a medical malpractice case that "a jury award for the lost future earnings of an infant ... will *not* be set aside by this Court as *speculative* ... where the award of lost future earnings is within the range of estimated future earnings, based upon various life scenarios, reduced to present value, established by the expert testimony of an economist at trial...."[39]

With respect to Mr. Johnson's lost income in particular, the court also concludes that it is decidedly premature to conclude that any award would be speculative. The court has not been advised by the government of the particulars of Mr. Johnson's financial circumstances—e.g., whether he was employed at the time of his death, whether he was receiving a "dividend" or financial support from his Tribe, or whether he was receiving unemployment insurance or other government assistance that might be regarded as "income." Moreover, it is clear from the information already before the court that, although Mr. Johnson had only recently graduated from high school, he had been periodically employed. It seems likely that there would have been at least *some* future employment for Mr. Johnson during the decades that he would have expected to live had he not been killed by defendant Bedonie. Mr. Johnson was also a promising young artist. He had drawings for sale at an art museum in Phoenix and was planning to attend the Santa Fe Art School. Again, it seems likely that these activities would have produced at least *some* future income for Mr. Johnson during the many years he could have worked on his craft.

The general rule for tort cases is that once a plaintiff has shown damages with reasonable certainty, any uncertainty arising in the calculation of damages is resolved against the defendant.[40] The difficulty in ascertaining damages "should not militate in favor of the wrongdoer."[41] This approach would seem to apply with particular force where the defendant is no mere tortfeasor or "wrongdoer," but a convicted criminal who by killing a victim has blotted out any chance of productive life.

The court is aware that it is possible that the lost income calculation for Mr. Johnson may produce lower figures than for other persons with more readily-ascer-

---

**38.** *See, e.g., Frugis v. Bracigliano,* 177 N.J. 250, 827 A.2d 1040, 1061 (N.J.2003) (approving lost income award for infant where evidence shows "it reasonably probable ... that the capacity to earn a living will be affected"); *Russell v. Windsor Steamboat Co.,* 126 N.C. 961, 36 S.E. 191 (1900) (upholding lost income award for five-month-old infant); *Turfway Park Racing Assoc'n v. Griffin,* 834 S.W.2d 667 (Ky.1992) (granting new trial to parents of deceased child on issue of damages for child's destroyed power to earn money); *Balmer v. Dilley,* 81 Wash.2d 367, 502 P.2d 456 (1972) (allowing recovery of damages for loss of future earnings during normal life expectancy of deceased minor). *But cf. DiDonato v. Wortman,* 320 N.C. 423, 358 S.E.2d 489 (1987) (refusing to allow recovery of damages for lost income of stillborn child). *See generally* M.L. Cross, *Annotation, Measure and Elements of Damages for Personal Injury Resulting in Death of Infant,* 14 A.L.R.2d 485 (1950 & 2003 Supp.).

**39.** *Andrews v. Reynolds Memorial Hospital, Inc.,* 201 W.Va. 624, 499 S.E.2d 846, 854 (1997) (emphases added).

**40.** *Brawthen v. H & R Block, Inc.,* 52 Cal. App.3d 139, 124 Cal.Rptr. 845 (1975).

**41.** *Telex Corp. v. Int'l Bus. Mach. Corp.,* 510 F.2d 894, 932 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

tainable income streams. But even a modest lost income award could make a significant difference to Ms. Johnson. She credibly and poignantly testified at the earlier sentencing hearing about the devastating financial effects on her family of her son's death:

> To this day, I haven't been able to get caught up on my bills. I have to pay for my trailer and my car. I can't afford to pay for my propane, electricity and water payments, so I have been turning to the church to help me out. I also can't afford to buy personal needs, food and even to do my laundry.
>
> I also have a daughter who is in high school and she needs school supplies. And at the beginning of the school year, I couldn't even afford to buy her any clothes or any school supplies. We also have livestock that we can't afford to buy hay to feed them. Many times I have turned to my family for help, but they can only do so much. They have their own bills to pay.
>
> My bi-weekly income is around $200. Right now I only have one job and I work six days a week. This job is 25 miles away form where we reside....
>
> The reason I am bringing all this up is because it seems like all of these things have come about since the loss of my son. It has been hard for me to function like a normal person.
>
> Brian worked at different jobs. He would help me pay some bills.[42]

At the very least, the court concludes it is desirable to have an expert opinion about

whether Mr. Johnson suffered lost income as the result of the defendant's crime.

The court also recognizes that there are legal questions about whether the defendants should pay lost income restitution for the deaths they caused. Among these questions are:

- in homicide cases, does the MVRA permit awards for lost income or are the awards limited to funeral and similar expenses?

- if lost income awards are permitted, do the tort law precedents authorizing lost income awards for infants or those with uncertain income streams translate into the restitution area?

- does the Seventh Amendment require a jury trial on restitution awards for lost income? [43]

The court's view at this stage, having not received briefing on these subjects, is that none of these issues block lost income restitution. In fairness to all sides, however, the court invites briefing on all these legal questions and any others that the parties wish to raise at the upcoming hearing. But at this stage in the proceedings, the court concludes that the government's objections to obtaining expert evidence about victims' potential lost income are without merit.

### The Government Is Obligated to Assist Crime Victims Obtain Restitution

 The court reluctantly concludes it must also raise a related point: the government may be inadvertently failing to meet its statutory obligations to assist

---

**42.** Tr. of Sentencing Hr'g, January 21, 2004, at 6–7.

**43.** *Compare United States v. Nichols,* 169 F.3d 1255, 1279 (10th Cir.1999), *cert. denied,* 528 U.S. 934, 120 S.Ct. 336, 145 L.Ed.2d 262 (1999) (identifying the MVRA as *civil* in nature) *with* Margaret Raymond, Note, *The Un-* *constitutionality of the Victim and Witness Protection Act Under the Seventh Amendment,* 84 COLUM. L.REV. 1590 (1984). *See generally* Note, *supra,* 86 IOWA L.REV at 1039 n. 200 (2001) (noting that Seventh Amendment challenges to the MVRA have generally been rejected by identifying the MVRA as *criminal* in nature).

crime victims. In these cases, the government has not merely remained neutral; it has positively *opposed* investigation of a possible restitution award. Perhaps this posture would be appropriate if some significant interest of the United States were at stake. But the government's terse, one-paragraph objections in both cases offer no hint as to how it might harmed by the court's investigation of possible lost income of Beyonce and Mr. Johnson.

The government's stance is seemingly at odds with the requirement that it help crime victims obtain restitution. Under the Crime Victims' Bill of Rights, "[o]fficers and employees of the Department of Justice ... shall make their best efforts" to afford crime victims the rights listed in the Bill of Rights.[44] The Bill of Rights, in turn, identifies an unqualified "right to restitution" as one of these rights. Victims also are given "[t]he right to confer with [the] attorney for the Government in the case."[45] The implementing statute to the Bill of Rights further requires Justice Department personnel to "inform a victim of *any* restitution or other relief to which the victim *may* be entitled under this or any other law and [the] manner in which such relief may be obtained."[46] This is consistent with the requirement in § 3664 that *"the attorney for the Government"* shall "consult[ ], to the extent practicable, with all identified victims regarding restitution."[47] The Crime Victims' Bill of Rights also defines the "victim" in a child homicide case as the legal guardian or parent.[48]

So far as the court can tell, the Justice Department has not discussed with Beyonce's mother—her legal guardian and parent—the fact that restitution for lost income is a possibility. Nor has the Department discussed lost income restitution with Ms. Johnson. (In light of these omissions, the court has requested that the probation officer determine their views on the subject.) Instead, the Department apparently made a unilateral decision to oppose even investigating the possibility of such awards. Based on the information currently before it, the court cannot understand how the Department's actions are consistent with its obligations under the Crime Victims' Bill of Rights to make best efforts to protect the victims' "right to confer" with the government and the "right to restitution." Nor can the court see how the government has met it's duty to "consult[ ]" with victims about restitution.

The court is aware that the Crime Victims' Bill of Rights restricts the remedies that victims can pursue after the fact if Department attorneys fail to discharge their obligations.[49] In particular, the Bill of Rights specifies that it "does not create a cause of action or defense in favor of any person arising out of the failure to accord to a victim the rights enumerated...."[50] Similar language is found in the restitution statute.[51] But these limitations make it all the more important for the Department to zealously *protect* crime victims' rights on its own initiative. If a failure comes to the court's attention while there is still time to

---

44. 42 U.S.C. § 10606(a).

45. 42 U.S.C. § 10606(b)(5).

46. 42 U.S.C. § 10607(c)(1)(B) (emphases added).

47. 18 U.S.C. § 3664(d)(1) (emphasis added).

48. *See* 42 U.S.C. § 10607(e)(2)(B)(ii) & (iii).

49. *See generally United States v. McVeigh,* 106 F.3d 325, 328–33 (10th Cir.1997), *overruled in result by* Pub.L. No. 105–6 (*codified at* 18 U.S.C. § 3510).

50. 42 U.S.C. § 10606(c).

51. *See* 18 U.S.C. § 3664(p).

rectify it, the court must direct compliance with the law.

The United States Attorney's Office for the District of Utah has an exemplary record in protecting the interests of crime victims. And, in this case in particular, the prosecutors handling these matters have also exhibited the utmost attention to victims' concerns whenever appearing in court. In light of these facts, the court is reluctant to come to a firm conclusion regarding possible violations of the government's obligations to assist victims without further information. Accordingly, the government is directed to reconsider its objections to the appointment of experts in both of these matters. Within 21 days of the date of this order, the government shall either withdraw its objections or reaffirm its objections. Should the prosecutors handling these matters choose to reaffirm the objections, they shall provide additional explanation about the objections' grounds and their consistency with the Department's obligations to crime victims. The prosecutors shall also coordinate their positions on reaffirming any objection with the Justice Department's Office for Victims of Crime.

Should the government choose to reaffirm its objections, the government attorneys (and their agents, such as a victim-witness coordinator) may have additional obligations under the Crime Victims' Bill of Rights and rules of professional conduct. To avoid confusion in this evolving area of law, the court will sketch out its understanding of these requirements.

The court will assume, without deciding, that the Crime Victims' Bill of Rights does not create an attorney-client relationship between the prosecutor handling the case and the victims (in this context, Beyonce's mother and Ms. Johnson).[52] In light of this fact and the fact that victims lack legal training and are obviously unable to afford legal counsel, the prosecutors must take care to avoid creating confusion about whether they are helping the victims obtain full restitution. In particular, if the government continues to oppose the court's efforts to investigate restitution for lost income, then the prosecutors should make clear to the victims this adversary posture. The prosecutors should also refer the victims to possible sources of legal assistance for impoverished persons in our community (e.g., legal aid) or perhaps petition the court for appointment of independent legal counsel on their behalf.[53]

This requirement that prosecutors disclose any conflict stems from both the standard rules of professional conduct and the Crime Victims' Bill of Rights. Rules of professional conduct, such as the rules in effect in Utah, direct that "[w]hen the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."[54] Victims of violent crimes would generally understand the prosecutor to be seeking the full restitution that the law might allow. When the prosecutor takes a different stance, that victim must be told. Likewise, under the Crime Victims' Bill of Rights, the prosecutor must use "best efforts" to secure for crime victims their "right to restitution." Where government

**52.** *See United States v. Whittaker,* 201 F.R.D. 363, 368–369 (E.D.Pa.2001), *rev'd on other grounds,* 268 F.3d 185 (3rd Cir.2001).

**53.** *See, e.g.,* Ariz. R.Crim. P. 39 ("In any event of any conflict of interest between the state or any other prosecutorial entity and the wishes of the victim, the prosecutor shall have the responsibility to direct the victim to the appropriate legal referral, legal assistance, or legal aid agency").

**54.** Utah Rules of Prof'l Conduct R. 4.3 (2003).

attorneys believe that their ethical obligations to the United States require them to oppose a victim's restitution claim, they must still meet their "best efforts" obligations. These potentially conflicting obligations can be reconciled if a prosecutor refers the victim to another source of legal assistance.

## IV. Appointment of an Expert

For all of the foregoing reasons, the court finds the objections to the appointment of an expert to be without merit and, further, that the appointment of an expert to consider lost income is desirable. The parties have not offered any experts for consideration by the court. The court therefore appoints a skilled economist— Paul A. Randle of Paul A. Randle and Associates—as an impartial and neutral expert on the issue of possible lost income by the victims in this case.

Assuming that he accepts the appointment, Mr. Randle is directed to prepare a report answering the question whether the estate's of, respectively, (1) Beyonce Serawop and (2) Brian Johnson have lost income as result of the defendants' homicides and, if so, what the losses were. The report shall only calculate a restitution amount that will "reimburse the victim for income lost by such victim as a result of [the] offense."[55] The report will disclose the methodology by which this calculation is made. Mr. Randle shall be compensated by the court at the rate of $100 per hour, up to a maximum (without further leave of court) of 40 hours.

Mr. Randle shall provide a copy of the report to the court, for distribution to the parties, by March 18, 2004. A copy of Mr. Randle's curriculum vita shall also be provided to the court at that time. Before completion of the report, counsel are permitted to send to Mr. Randle in writing, with a copy to the court and opposing counsel, any information that they believe he should consider in preparing his report. The prosecution and the probation office are directed to assist Mr. Randle by promptly obtaining any information that he may need to prepare the report. The court authorizes disclosure of the presentence reports in these cases to Mr. Randle. Any documents that the probation office or prosecution transmit to Mr. Randle shall also be transmitted to defense counsel. The parties shall file any objections to Mr. Randle's report by March 24, 2004.

Apart from the facts of this case, the parties may also have legal arguments against awarding restitution. Defense counsel are directed to file any legal arguments against awarding restitution for lost income by March 15, 2004. The government shall file any response by March 22, 2004.

The court will hold a hearing on restitution and other sentencing issues in both of the cases at issue on March 25, 2004, at 3:00 p.m. Mr. Randle shall appear at the hearing and counsel for all parties will be free to examine him at that time. The court will also hear argument on any and all issues the parties wish to raise concerning appropriate restitution in these cases.

### Conclusion

For the foregoing reasons, the court appoints an expert on possible lost income restitution.

## ORDER REJECTING TIMING OBJECTIONS TO APPOINTMENT OF AN EXPERT ON RESTITUTION

In a separate order entered today, the court has appointed an expert to review possible restitution for lost income in this case. That separate order explained why all objections to appointment of a lost in-

---

55. 18 U.S.C. § 3663A(b)(2)(C).

come expert were without merit, except the objection based on timing of the appointment. This order explains why the court finds the objections to the timing of the appointment to be without merit.

A quick review of the relevant facts is helpful at the outset. Defendant Bedonie pled guilty to Involuntary Manslaughter on October 10, 2003. A presentence report was prepared, which gave an uncontested sentencing range of 12 to 18 months. The report also listed restitution as being due for $4,068.74 for funeral expenses and $117.01 for lost wages due to Ms. Johnson for attending court hearing. The report further noted that Ms. Johnson sought reimbursement for $3,140 for services of a Native American medicine man in connection with the burial of her son, leaving resolution of the appropriateness of this amount to the court.

At the sentencing hearing, held on Wednesday, January 21, 2004, the court heard from counsel for the government and defense counsel. The defense raised no objection to restitution, except for the restitution for the services of a medicine man. The court then heard from Ms. Johnson directly. Ms. Johnson credibly testified to her impoverished circumstances, to her son's earning potential as a budding young artist, his past employment, and her son's provision of some financial support to her—financial support that had disappeared with his death.[56] (These matters were also included in the presentence report, without objection from the defendant.[57]) Ms. Johnson also explained why the services of the medicine man were connected with her son's burial.

During the hearing, it was apparent to the court that Ms. Johnson was seeking as much restitution as could be legally ordered. The court asked the government whether there was any authority for awarding lost income in homicide cases. The government asserted that there was not.

The court then imposed a prison sentence at the top end of the applicable guideline range—18 months. The court also awarded restitution for all the amounts listed in the presentence report, including the medicine man. The court promised an opinion to follow on these restitution amounts.

The court signed a judgment the next day, on Thursday, January 22, 2004. In the course of preparing an opinion on the restitution amounts, however, the court reached the conclusion that the government's earlier representation on lost income—that no authority supported such an award—was inaccurate. To the contrary, the court concluded that it was *statutorily obligated* to order restitution for lost income pursuant to the *Mandatory Victims Restitution Act* (MVRA).[58] Accordingly, on Friday, January 30, 2004, the court entered a revised judgment pursuant to Rule 35(c) of the Federal Rules of Criminal Procedure, which authorizes the court to correct an erroneous sentence. The court added to the judgment restitution in the amount of $50,000 for lost income (as well as an additional $180 for lost income that Ms. Johnson incurred in traveling to the sentencing hearing, as required by the MVRA). At the same time, the court recognized that defense counsel had not had an opportunity to challenge the legal and factual underpinnings on this award. As a matter of simple fairness to protect the interests of the defendant, the court followed up with an order holding the amend-

---

56. Tr. 1/21/04 at 6–8; *see also* Order Appointing Expert on Possible Lost Income Restitution (quoting salient parts of this testimony).

57. *See* Presentence Report, ¶¶ 16 & 17.

58. 18 U.S.C. § 3663A.

ed judgment in abeyance and setting an expedited briefing and argument schedule to permit the defendant to raise any objections.

Defendant Bedonie has now raised an objection to the timing of the amended judgment. She does not argue that the order fell outside the kinds of corrections authorized by Rule 35(c). Rather, her sole claim here is that the order fell outside the seven-day time limit specified in the rule. By her count, the court acted nine days after sentencing—from sentencing on Wednesday, January 21, to the amended judgment on Friday, January 30. The defendant has simply miscounted days, at least under the rules governing this issue. Rule 45(a) of the Federal Rules of Criminal Procedure specifies that "[w]hen a period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays and legal holidays shall be excluded." Accordingly, subtracting Saturday and Sunday from the nine days calculated by the defendant means that the court acted (at most) seven days after sentencing, within the prescribed period of time. Accordingly, this objection is without merit and rejected for this reason alone.

The defendant's objection is without merit for a separate and independent reason. The court has the ability to hold open restitution proceedings for a period of 90 days to ascertain a victim's final losses.[59] The Tenth Circuit has recently instructed that this 90-day period is to be "liberally construed" with an eye to "protect[ing] victims against the dissipation of defendants' assets," rather than "protect[ing] defendants from a drawn-out sentencing process or to establish finality."[60] Moreover, the Circuit has recognized that this 90-day period is designed to create a

procedure "pursuant to which victims can request additional compensation for additional losses discovered at any time in the future."[61] The court's appointment of an expert on lost income, well within the 90-day period, is permitted by this statute. Defendant Bedonie's objection is therefore overruled for this reason as well.

---

**59.** 18 U.S.C. § 3664(d)(5).

**60.** *United States v. Reano*, 298 F.3d 1208, 1212 (10th Cir.2002).

**61.** *Id.* at 1212 (*citing United States v. Dando*, 287 F.3d 1007, 1010 (10th Cir.2002), *cert. denied*, 537 U.S. 917, 123 S.Ct. 301, 154 L.Ed.2d 202 (2002)).