**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**February 21, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAVID VARGAS,

    Defendant - Appellant.

No. 22-1400
(D.C. No. 1:21-CR-00024-RBJ-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **ROSSMAN**, **KELLY**, and **MURPHY**, Circuit Judges.
_____

Defendant-Appellant David Houston Vargas was convicted after a jury trial of two counts of Hobbs Act robbery and aiding and abetting the same, 18 U.S.C. §§ 2, 1951(a); two counts of brandishing a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii); and one count of possession of a firearm by a prohibited person, 18 U.S.C. § 922(g)(1).  2 R. 9.  The district court sentenced Mr. Vargas to 318 months' imprisonment and three years' supervised release.  1 R. 169–70.  On appeal, Mr. Vargas claims the district court erred in applying physical-restraint enhancements to the robbery convictions, see U.S.S.G. § 2B3.1(b)(4)(B).  Aplt. Br. at

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

13.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

**Background**

Mr. Vargas and an accomplice entered a Foot Locker store and began removing merchandise from shelves.  2 R. 10.  According to one of the store employees, when a co-worker tried to interfere, Mr. Vargas displayed a revolver, which was pointed downward.  The employee heard a "click" which he believed to be the revolver's chamber[1] clicking into place.  2 Aplt. Supp. R. 504, 787.  Mr. Vargas then told the employee, "You're going to have to let us take everything[.]"  Id. at 787.  In response, the employee asked, "What do you need me to do?"  Id. at 797.  Mr. Vargas, mistaking the employee's scanner for a cellphone, stated, "Put down the phone."  Id. at 788–89, 797.  The employee placed the scanner and a shoe on the ground, backed away, and raised his hands above his head.  Id. at 789.  His co-worker did the same.  Aplee. Br. at 15 (citing Gov. Ex. 1B at 01:55).  The employee further testified that a few moments later, Mr. Vargas "was just kind of telling me, you know, like, Don't call the cops.  Don't do anything. . . .  Go stand back there with

---

[1] The store employee testified, "It just sounded like he opens the casing of the revolver and just swung it and then clicked it in."  2 Aplt. Supp. R. 504.

your hands up[.]" 2 Aplt. Supp. R. 798. Mr. Vargas and his accomplice continued to grab merchandise before leaving the store. Id. at 790, 801.

After the Foot Locker robbery, Mr. Vargas and his accomplice drove to Designer Shoe Warehouse (DSW). At the checkout counter, the cashier processed the sale of several pairs of shoes. Gov. Ex. 4C (DSW robbery video). Surveillance footage shows Mr. Vargas removing the large, silver revolver from his hip pack and placing it on the counter with the barrel facing the cashier. Id. at 03:16–03:18. The cashier heard "a big slam on the counter" and saw the gun from her peripheral vision. 2 Aplt. Supp. R. 577. Mr. Vargas did not grab the pistol by its grip but placed his hand over the chamber, with his fingertips covering the trigger guard. Gov. Ex. 4C at 03:18. The barrel remained fixed on the clerk for most of the robbery. When a shoe box fell behind the counter, Mr. Vargas made a gesture with the gun, telling the cashier to pick it up. Id. at 03:21–03:28; 2 Aplt. Supp. R. 578. After the cashier returned the fallen box to the counter, Mr. Vargas and his accomplice left with the stolen merchandise. 2 Aplt. Supp. R. 579.

Later that night, police officers observed a car driven by Mr. Vargas cut across traffic and make an illegal turn. 2 Aplt. Supp. R. 656–57. Officers engaged in a high-speed chase, during which a passenger fired several shots at officers and the pursuing officer returned fire. Id. at 658–675, 697, 701. Eventually, the car crashed into another vehicle, and the suspects fled on foot, firing more shots at officers. Id. at 703–07. Mr. Vargas and his accomplice escaped that night, id. at 208–13, but Mr. Vargas was apprehended a few weeks later, id. at 70.

3

A jury convicted Mr. Vargas on all charged counts but one.  In calculating Mr. Vargas's offense level, the presentence report (PSR) applied two, two-level enhancements under U.S.S.G. § 2B3.1(b)(4)(B): one for physically restraining Foot Locker employees and one for physically restraining the DSW cashier.  2 R. 14.  Probation indicated that they "applied both enhancements for restricting movement."  3 Aplt. Supp. R. 25.  The adjusted offense level for the Foot Locker robbery post-enhancement was 22, and the adjusted offense level for the DSW robbery and subsequent flight post-enhancement was 30.  2 R. 14–15.  The Sentencing Guidelines require that the greater adjusted offense level applies — in this case, 30 for the DSW robbery — but they also require an adjustment for multiple counts depending on the number of units assigned to each count.  See U.S.S.G. § 3D1.4.  Here, the PSR assigned one unit to the DSW robbery and flight and one-half unit for the Foot Locker robbery.  2 R. 15.  The combined 1.5 units resulted in a one-point increase to the adjusted offense level from 30 to 31.  Id. at 16.

Combined with a criminal history category of VI, 2 R. 25, the guideline range for the robberies was 188 to 235 months, id. at 29.  Mr. Vargas objected to the application of the physical-restraint enhancements on the grounds "that he only displayed [or showed] the firearm to store employees[.]"  1 R. 148; 3 Aplt. Supp. R. 22–23.  The district court found that physical restraint was clearer in the DSW robbery but nonetheless overruled the objection.  3 Aplt. Supp. R. 27–28.  The district court adopted the PSR's recommendation but varied downward to 150 months

4

for the robberies and imposed additional sentences for the remaining convictions resulting in a total sentence of 318 months.  Id. at 58.

**Discussion**

In reviewing the district court's application of an enhancement under the guidelines, we review its factual findings for clear error.  United States v. Walker, 74 F.4th 1163, 1195 (10th Cir. 2023).  We review de novo the district court's interpretation of the guidelines and the sufficiency of the evidence supporting the enhancement.  Id.  Here, Mr. Vargas challenges the sufficiency of the evidence supporting the enhancement and the district court's interpretation of the guidelines. He argues that he merely brandished a weapon during the robberies, which is insufficient to support application of the enhancement.  Aplt. Br. at 13.  The government, acknowledging that the enhancement requires something more than merely displaying or brandishing the gun, responds that Mr. Vargas's actions were sufficient to apply the enhancement.  Aplee. Br. at 12–13.  Although Mr. Vargas argues that the government equates brandishing and placing the victims in fear with physical restraint, that is a mischaracterization.

U.S.S.G. § 2B3.1(b)(4)(B) requires a two-point enhancement to the defendant's offense level "if any person was physically restrained to facilitate commission of the offense[.]"  The guidelines commentary defines "[p]hysically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up."  Id. § 1B1.1 cmt. n.1(L).  However, we have concluded that the

enhancement applies "when the defendant uses force, including force by gun point, to impede others from interfering with commission of the offense." United States v. Pearson, 211 F.3d 524, 525–26 (10th Cir. 2000).  "Physical restraint is not limited to physical touching of the victim." United States v. Fisher, 132 F.3d 1327, 1329 (10th Cir. 1997).[2]  Rather, "the defendant's conduct must hold the victim back from some action, procedure, or course, prevent the victim from doing something, or otherwise keep the victim within bounds or under control." United States v. Checora, 175 F.3d 782, 791 (10th Cir. 1999).

Of course, mere brandishing, display, or possession of a gun, however, does not "automatically create a situation where physical restraint of an individual occurs." Pearson, 211 F.3d at 526.  "Instead, something more must be done with the gun" to apply the enhancement. Id. at 526–27.  We found something more in United States v. Miera, 539 F.3d 1232 (10th Cir. 2008).  There, two men entered a bank, one instructed the occupants to "put their hands up" and "don't move" and pointed a gun around the room while the other demanded cash. Id. at 1233.  We affirmed the district court's application of the physical-restraint enhancement, providing three reasons in support: "[A] firearm was pointed about the bank, presumably taking in all those present within its ambit; individuals were commanded not to move; and the

---

[2] At oral argument, Mr. Vargas urged us "to return to the physicality that the guidelines offer as examples, in terms of being bound up, in terms of being tied, in terms of being physically restrained."  Oral Argument at 06:56–07:07.  But we already rejected that approach in Fisher and reiterated that physical touching is unnecessary in United States v. Miera, 539 F.3d 1232, 1234 (10th Cir. 2008).

bank's customer exit was effectively blocked." Id. at 1236. Consistent with prior cases, we reiterated that "[k]eeping someone from doing something is inherent within the concept of restraint." Id. at 1235–36 (quoting Fisher, 132 F.3d at 1330) (ellipses and emphasis omitted).

**1. Foot Locker robbery**

There was sufficient evidence adduced at trial to warrant application of the enhancement to the Foot Locker robbery. Mr. Vargas did something more than brandish the weapon: Mr. Vargas (1) clicked the revolver's chamber into place, while simultaneously telling Foot Locker employees, (2) "You're going to have to let us take everything" and, later, (3) "Put down the phone." "Don't call the cops. Don't do anything." And, "Go stand back there with your hands up[.]" These directives had the same effect as the defendants' actions in Miera — they kept employees from doing something, that is, interfering with the commission of the robbery. Foot Locker employees likely and reasonably concluded that failure to comply would result in grave consequences. This much is clear from security camera footage showing the employees frozen with their hands in the air.

That Mr. Vargas never pointed the gun at an employee does not change our conclusion. We have never held that individual targeting is necessary for application of the enhancement. Miera, 539 F.3d at 1235. In Miera, for instance, we concluded that the act of pointing the gun around the room likely "had the effect of physically restraining everyone in [the gunman's] presence[,]" even assuming the gunman "somehow avoided targeting any particular individual with the firearm[.]" Id. By

brandishing the gun, clicking the chamber into place, and issuing demands that restricted the employees' movement and actions, Mr. Vargas's conduct was sufficient to trigger the enhancement.

### 2. DSW robbery

We likewise find Mr. Vargas's behavior in DSW sufficient to warrant application of the enhancement. In Pearson, we held "the conduct of holding and pointing a gun directly on someone to physically restrain them [was] even more egregious than the 'otherwise use,' brandishing, displaying or possessing a gun during the course of the robbery." 211 F.3d at 527. Here, Mr. Vargas placed a large revolver on the counter, pointed the barrel at the cashier, ordered her to pick up a fallen shoe box, and she complied. For most of the robbery, the weapon's barrel remained fixed on the cashier. Consistent with our holding in Pearson, there is no question that Mr. Vargas did something more than merely brandish the revolver. As a result, he physically restrained the cashier.

In an effort to persuade us otherwise, Mr. Vargas argues that he "could not have fired the gun" because he was "grabbing the gun around the casing[.]" Aplt. Br. at 28. We are not persuaded. Mr. Vargas could have fired the revolver in a split-

second by simply shifting his grip and pulling the trigger.  The district court did not

err in applying the enhancement.

AFFIRMED.


Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge